In re Melvin Leslie WANING, Debtor.

WALLINGFORD'S INC., Plaintiff,

v.

Melvin Leslie WANING,
Debtor/Defendant.

Bankruptcy No. 89–10369.
Adv. No. 89–1067.

United States Bankruptcy Court,
D. Maine.

Nov. 19, 1990.

608

Warren C. Shay, Perkins, Townsend & Shay, P.A., Skowhegan, Me., for plaintiff.

Robert E. Cox, Jude and Cox, Newport, Me., for debtor/defendant.

JAMES B. HAINES, Jr., Bankruptcy Judge.

Before the Court is Adversary No. 89–1067, by which the Plaintiff, Wallingford's, Inc. ("Wallingford's") seeks to establish that its claims against the Debtor/Defendant, Melvin Leslie Waning ("Waning") are excepted from discharge. For the reasons set forth below, the Court today enters judgment for the Defendant.

## BACKGROUND

Waning filed a Chapter 7 voluntary petition in bankruptcy on August 25, 1989. Among his creditors he listed Wallingford's as holding an unsecured claim in the amount of $24,000.00. By complaint dated December 13, 1989, Wallingford's filed this adversary action to determine the dischargeability of the debt from Waning. Wallingford's asks that it have judgment against Waning for $26,676.05, and that the entire amount be excepted from discharge by application of 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), or § 523(a)(6).[1] The matter was tried on October 11, 1990. Pursuant to Bankruptcy Rule 7052 the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Wallingford's is a Maine corporation engaged in the business of distributing logging equipment. It has places of business in Oakland, Maine, and in Tilton, New Hampshire.

In approximately 1982, Wallingford's began supplying inventory to Melvin Waning, who wholesaled it to dealers and sold it to retail customers from his own store in Dixmont, Maine. In addition to his store sales, Waning also sold a substantial volume of

---

**1.** References to the Bankruptcy Code of 1978, as amended, 11 U.S.C. § 101 *et seq.* shall hereafter be to "Code § ___."

inventory directly from his truck to small timber-harvesting operations.

Wallingford's did not impose any restrictions regarding the nature of Waning's sales, the identity of his customers or the breadth of his territory. If Waning sold goods at retail, he was entitled to retain the difference between the sales price and the cost he was charged by Wallingford's. If the sale were to a wholesale dealer, Waning would be paid a commission equivalent to 6% of the invoiced amount.[2] Whether goods were sold at retail or wholesale, Waning was not billed for them by Wallingford's until he reported them as sold. Although Wallingford's kept Waning supplied with a basic stock of goods, he was also able to obtain items on a "special order" basis. When Waning had a customer for goods that he did not have in stock, he would special order them, usually by phone. Wallingford's would provide them to Waning, together with an invoice calling for payment within ten days.[3]

Waning reported his monthly sales by telephone to David Seneca, Wallingford's operations manager. During these conversations the two would review a list of the items supplied by Wallingford's that Waning held for sale to determine what had been sold during the preceding month and what new items were needed. Seneca would replenish Waning's inventory based on what was reported as sold, although changes in supply and Waning's expressed needs would make for variations from month to month. Seneca never verified sales, but rather accepted Waning's reports.

Waning testified that he kept track of sales by "filing" sales slip duplicates in the cab of his truck. The system he employed was less than foolproof.

Following Waning's monthly reports, Seneca would provide new inventory to Waning and would send him a new inventory print-out, listing all items that Wallingford's records showed Waning had on hand. Seneca would forward notes of his conversations with Waning to Lana Dearborn, Wallingford's office manager. Ms. Dearborn prepared and dispatched invoices indicating the amounts due for the goods that Waning had reported sold. The invoice terms required payment within ten days and imposed interest of 2% per month on unpaid balances.

Waning was neither regular nor prompt in his payment of the invoices. Over the eight years he worked with Wallingford's, Waning's account was not kept current. Unpaid balances rose and fell from month to month. Irregularly, Waning would bring his account up to date. As payments were received, Wallingford's applied them to the oldest outstanding invoices.

In late June or early July of 1989, Seneca and Ms. Dearborn reported to John Wallingford, Wallingford's president, that Waning's account was seriously in arrears, and that Waning could not be reached to discuss the issue. On July 6, 1989, John Wallingford met with Waning at Waning's place of business[4] to express his concern about the account. John Wallingford also observed that the goods on hand appeared to be fewer than what was shown on the latest monthly inventory. When asked about the arrearages and the apparent absence of inventory, Waning explained that some items remained at his old facility, that some had been consigned to dealers, and that other inventory had been sold to customers who had yet to pay him. John Wallingford requested an accounting of non-cash sales so that Wallingford's could collect Waning's receivables. In response to the demand, Waning provided Wallingford's with a list indicating a total of $12,903.00 due to him from his customers.

---

**2.** Except for some sales of chain saws early in the relationship, all sales were treated as retail sales.

**3.** The difference in billing procedure for special orders was explained by both parties by the shared assumption that Waning would specially order goods only for which he had a buyer.

Thus, given the imminent sale, immediate billing would be consistent with the billing practice for other goods.

**4.** By this time Waning had moved his retail outlet from Dixmont to Newport, Maine.

At the close of the July 6, 1989 meeting, Wallingford asked that the inventory remaining in Waning's possession be returned to Wallingford's warehouse. Waning's account was closed. No additional inventory was sent to him.

Waning returned the inventory to the warehouse on July 18, 1990. John Wallingford prepared a handwritten itemization of the returned goods as they were off-loaded. Based on that itemization, Wallingford's determined that $10,550.03 worth of inventory which its records showed had been sent and which had not been reported as sold was not returned. Wallingford's charged Waning for the unreturned merchandise by invoice dated July 18, 1989. In addition, on July 25, 1989, Wallingford's billed Waning $449.54, which represented a 20% "restocking" charge and a charge for damage to the returned goods.[5]

Wallingford's claims it is owed $26,-676.05, representing principal and interest due on account for goods reported as sold and invoiced, but not paid; the $10,550.03 shortfall in inventory (never reported as sold before July 18, 1990 and, therefore, previously unbilled); and the $449.54 restocking and damage charge.

## CONCLUSIONS OF LAW

A. Dischargeability Issues.

1. *Wallingford's, Claim is Not Excepted to Discharge Pursuant to Code § 523(a)(2)(A).*

■ Code § 523(a)(2)(A) provides that an individual debtor is not discharged from any debt:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ...

Wallingford's contends that Waning intentionally made false monthly sales reports to it which, in turn, caused it to ship additional inventory to him. Wallingford's claims that such conduct amounts to obtaining property by false pretenses, false representations, or actual fraud so as to except its debt from discharge because, but for the understated sales reports, it would have policed the account and would have ceased supplying goods to Waning "sooner" than it did.

For the debt to be excepted from discharge under § 523(a)(2)(A) it must be shown that property was obtained by "false pretenses, false representations, or actual fraud." The burden of demonstrating clearly and convincingly that a debtor obtained property through false pretenses or by false representation is on the plaintiff. *In re Parker*, 59 B.R. 721 (Bankr.D. Mass.1986); *In re Toscano*, 23 B.R. 736 (Bankr.D.Mass.1982).

■ The complaining creditor must show that the Debtor obtained property by means of representations which he knew were false or which were made with reckless disregard for their truthfulness, that the debtor intended to deceive the creditor through misrepresentations, and that the creditor reasonably relied, to his detriment on debtor's misrepresentations. *In re Coughlin*, 27 B.R. 632 (Bankr. 1st Cir. 1983); *In re Parker, supra.*

Waning has a ninth grade education. He testified that when he sold inventory from his truck he would complete a sales slip in duplicate. He would leave the original with the customer and retain the other for his records. He testified that he collected and relied on the slips to account to Wallingford's for the inventory sold. Nothing suggests that at the time he made monthly accountings Waning knew his records were inaccurate and thus regularly intended to make false monthly representations to Wallingford's.

A creditor must also demonstrate that the debtor intended to deceive the creditor

---

**5.** As with other aspects of the relationship, there are no written terms treating the allocation of risk of loss or damage to the goods supplied to Waning or the imposition of the restocking charge for returned goods. Waning did not, however, challenge those charges at the time they were imposed or at trial.

through his false representations. Frauds included in § 523(a)(2)(A) are those which involve moral turpitude or intentional wrong. *In re Toscano, supra.* A creditor must establish that the representations were knowingly and fraudulently made. *In re Kisich,* 28 B.R. 401 (Bankr. 9th Cir. 1983). The evidence does not show that Waning intended to induce Wallingford's to sending him more inventory by knowingly misrepresenting what had been sold by him. Although his business practices may have been less than model, the Court cannot ascribe intentional deception to Waning's behavior. He assumed he was holding up his end of the bargain by continuing to do what he had done all along. If Waning's practices in tracking and reporting inventory and sales were unacceptably shoddy, one thing can be said for them: they were consistently employed and consistently accepted by Wallingford's. Such a course of dealing does not support a finding of the required wrongful intent, or even recklessness. *See In re Coughlin, supra,* 27 B.R. at 636. *Cf. In re Parker, supra,* 59 B.R. at 723–24 (extraordinary credit card account activity immediately before filing supports inference of intent to defraud).

Waning's prior testimony purportedly contains an admission that on occasion he sold inventory without reporting the sales to Wallingford's.[6] However, Waning explained that he sometimes would not report a sale until he himself was paid by the customer. Only at that point did he apparently consider merchandise sold. No evidence was introduced as to whether the practice complained of was instituted only toward the end of the relationship or whether Waning employed it all along. The clear implication of Waning's testimony, supported by the history of the relationship and the parties' conduct, was that he postponed reporting non-cash sales as a general practice. Given the context, it cannot be concluded that Waning adopted such practices with the aim of inducing continued supply by Wallingford's.

■ An objecting creditor must also show that it reasonably relied, to its detriment, on the debtor's misrepresentations. *In re Parker, supra,* 59 B.R. at 723. Even if one were to accept that Wallingford's specifically relied on any particular representations, it has, in light of the account history, failed to establish that such reliance was reasonable. Seneca testified that, although he kept a list of Waning's inventory, he did not know of how much Waning owed and he had never checked to see what Waning's payment practices were. Wallingford's claims that it sent additional inventory to Waning believing he had inventory on hand that could simply be retrieved. But inventory so supplied, and the inventory Waning had on hand, did not secure, or even relate to, amounts already due, and overdue, on his account.

Wallingford's did not establish that it supplied additional inventory to Waning in reliance upon his representations as to what had been sold. Reported sales merely translated to increased amounts due on Waning's account. Seneca used the monthly reports simply to ascertain what additional goods should be shipped. He operated independently from Ms. Dearborn, who monitored Waning's account. If monthly sales reports and the alleged requirement for immediate payment were the cornerstone of the relationship, Waning would have been required to bring his account current each month. The balances grew and diminished over the years. Seneca testified that he regularly replenished Waning's stock according to Waning's requests.

■ Wallingford's also suggests that Waning's actions in overstating the amounts due him from his customers on his accounts receivable constitutes false pretenses so as to except its debt from discharge. It points to Waning's filed schedules of assets to demonstrate that the list supplied at Mr. Wallingford's request on July 6, 1989, set forth inflated receivables figures. Waning admitted that he intentionally inflated the accounts receivable list given to Mr. Wallingford in July. He stat-

---

6. The transcript of Melvin Waning's testimony at the § 341 meeting of creditors held on Octo-

ber 16, 1989 was admitted into evidence at trial by stipulation of the parties.

ed that he did so in an attempt to "buy time" from Wallingford's. Waning "hoped" he could mollify it long enough so that he could collect the accounts and then pay Wallingford's. Even given the admitted motive and misrepresentation, however, the fact remains that the list was given to Wallingford's in July, after the point when Mr. Waning was cut off from future supplies. No credit or advances were made in reliance upon it.[7]

Finally, even if the elements of the discharge exception were otherwise met, Wallingford's case is haunted by another, fatal inadequacy. There is simply no meaningful evidence of damages attributable to Waning's alleged derelictions. Wallingford's claims that had Waning been more accurate, or more forthright, in reporting sales, it would have never reached a point where his account was over $15,000.00 in arrears and over $10,000.00 in inventory it assumed Waning held was lost.

The scope of Code § 523's exceptions is limited to debts arising from the Debtor's actions. Wallingford's demands that $26,-676.05 be excepted from discharge. This figure is derived from the invoice of the same amount dated August 31, 1989 (Defendant's Exhibit 1). The total amount is comprised of the past-due account balance, $16,204.73; a 24% APR interest charge posted June 30, 1989, $245.39; the value of the shortfall not returned to Wallingford's warehouse on July 16, 1989, $10,550.03; and the restocking and damage charges, $449.54; less a $773.64 payment credited July 10, 1989. However, only that portion of the $26,676.05 which represents property obtained from Wallingford's, by Waning, as a result of false pretenses or representations or fraud, could be excepted from discharge. Plaintiff has not demonstrated a causal link between any specific actions of the Debtor and its own provision of credit.

Plaintiff has failed to sustain its burden of proving an exception to discharge under Code § 523(a)(2)(A).[8]

### 2. *Wallingford's Claim is Not Excepted to Discharge Pursuant to Code § 523(a)(4).*

Wallingford's also alleges that Waning's failure to account accurately for inventory sold and his failure to keep or deliver the proceeds from his sales constitute fraud or defalcation while acting in a fiduciary capacity and, thus, that its claim is excepted from discharge pursuant to Code § 523(a)(4). A discussion of the limited parameters of the § 523(a)(4) exception is, therefore, in order.[9]

Wallingford's alleges that it shipped goods to Waning for consignment sales and as consignee, Waning stood in a fiduciary relationship to it. Waning denies he was Wallingford's fiduciary. He contends that the transactions were merely sales on account.

█ In determining whether the relation of the parties is that of seller and buyer, or that of consignor and consignee, the court constructs their intention from the contract as a whole. *Shapiro v. Marzigliano*, 39

---

7. Mr. Wallingford testified that shipments to Waning were halted as of July 6, 1989 meeting. If property or services were obtained prior to the false representation, subsequent misrepresentations will have no effect upon discharge. *In re Cokkinias,* 28 B.R. 304, 307 (Bankr.D.Mass. 1983).

8. A majority of courts hold that elements establishing an exception to discharge under Code § 523(a)(2)(A) must be proved by clear and convincing evidence. *In re Coughlin, supra. But see Combs v. Richardson,* 838 F.2d 112, 116 (4th Cir.1988) (preponderance of the evidence). Although the majority rule, and the rule followed here, imposes the heavier burden, the Supreme Court has yet to put the issue finally to rest. *See In re Garner,* 881 F.2d 579 (8th Cir.1989),

cert. granted — U.S. ——, 110 S.Ct. 1945, 109 L.Ed.2d 308 (1990).

9. The application of the § 523(a)(4) exception is limited to those relationships to which fiduciary principles apply. "The classic statement of the fiduciary principle is that, within the scope of the relationship, the fiduciary is to act in a disinterested manner in the beneficiary's best interests." Mitchell, *The Death of Fiduciary Duty in Close Corporations,* 138 U.Pa.L.Rev. 1675, 1676 (1990). The preceding discussion creates the distinct impression that Wallingford's could not reasonably expect that Waning had undertaken to place its interests above his own. The details of its argument are discussed, and put finally to rest, below.

N.J.Super. 61, 120 A.2d 490 (1956), (addressing exception under Bankruptcy Act). There is no written agreement establishing, or even describing, the parties' relationship. Thus, the existence and terms of the agreement between the parties must be defined by their conduct. 17 Am.Jur.2d, *Contracts*, § 3 (1964).

A consignment sale may be an ordinary agency relationship or it may be utilized for creating a security interest. Exactly what it is depends upon the intent of the parties. 1 R. Anderson, *On the Uniform Commercial Code*, § 1–201:278 (3rd Ed. 1981 & Supp.1989). A consignment may be used as a security device when the goods are sent to a merchant who is unable to risk finding a market for them and the title remains in the consignor. It also may be used as a price maintenance device. *Id.* § 1–201:279.

Where the arrangement serves to assure retail price maintenance, it is generally referred to as a "true" consignment. In a true consignment, the goods belong to the consignor, even though they have been delivered to the consignee for sale. *Id.*

■ John Wallingford testified that Wallingford's had no understanding with Waning regarding the resale price of the inventory. The parties agreed Waning was liable to Wallingford's only for the invoiced amount. He could keep the full amount of his mark-up on retail sales. Waning understood that he was to maintain insurance covering the inventory shipped to him by Wallingford's. Thus, a true consignment was not created.

■ The business relationship before us resembles a credit sale or a sale or return rather than a consignment. A sale or return is distinguished from a consignment sale in that there is a true sale in which the title and risk of loss pass to the buyer and the buyer is entitled to retain all proceeds of resale, being liable to the original seller only for the payment of the purchase price of such goods. 3 R. Anderson, *On the Uniform Commercial Code*, *supra* § 2–327:16, 17.[10]

The court notes the similarities between the business relationship in *Shapiro v. Marzigliano, supra,* and that of Waning and Wallingford's.[11] In *Shapiro* the court was asked to decide whether a business arrangement whereby defendant-retailers obtained poultry from wholesaler-plaintiff and signed a receipt containing the printed term "consigned" was, in fact, a consignment. The receipt stipulated that title remained with the wholesaler, that the goods were not to be sold below a stated price, and that the retailers-consignees would assume liability for loss or deterioration of the goods. Despite the "consignment" label, the court found the course of dealing between the parties was a credit transaction.

> The evidence in the present case is that it was the frequent practice of the plaintiffs to carry the defendants' accounts for varying periods of time after expiration of the seven-day contractual period for payment and for the plaintiffs to deliver more merchandise to the defendants notwithstanding there were unpaid bills on prior deliveries. Some of the accounts for which recovery was allowed were three or four years old. Clearly, the plaintiffs were dealing with the defendants on a credit basis. *Id.,* 120 A.2d at 494.

Based upon a long history, Waning understood that he was dealing with Wallingfords' on a credit basis and that even if he were not able to pay his monthly invoice amount, Wallingford's would continue to

---

**10.** Because this action relates only to the relation of the immediate parties (as opposed to a battle of priorities involving third parties) "perfection" issues are not present. However, the fact that Wallingford's produced no evidence of compliance with 11 M.R.S.A. §§ 2–326 and 9–114, relating to protection of consignors' rights, or with 11 M.R.S.A. § 9–101 *et seq.,* relating to perfection of security interests, supports Wan-

ing's contention that goods were supplied to him on an unsecured, open account.

**11.** *Shapiro* addressed the "fiduciary fraud" exception to discharge as set forth in the Bankruptcy Act of 1898, as amended. The exception was adopted in the Bankruptcy Code of 1978. *See In re San Juan Hotel Corp.,* 847 F.2d 931, 954 (1st Cir.1988).

614

ship him additional inventory. This, in fact, it did. Its doing so was more than acquiescence. Wallingford's regularly carried balances on Waning's account and charged interest on those balances. Moreover, Wallingford's credited Waning's payments, which were irregularly submitted and often did not correlate with the amounts shown on the monthly invoices, to its oldest outstanding invoices. For these reasons, despite Wallingford's intention to create a consignment relationship, the court regards it a routine credit sale transaction.

Even if Wallingford's had "consigned" the inventory to Waning for sale, it would not necessarily follow that he was thereby its fiduciary. As a rule, a consignee or factor does not act in a fiduciary capacity as that term is used in the Bankruptcy Code. "[I]t has repeatedly been held that a consignee or factor does not act in a fiduciary capacity as the term is used in the Act; it applies only to technical trusts, such as arise from the relationship of attorney, executor or guardian." *Shapiro v. Marzigliano, supra* at 493 (citing *Hennequin v. Clews*, 111 U.S. 676, 4 S.Ct. 576, 28 L.Ed. 565 (1884)).

■ Generally, the fact that funds are held by agents, bailees, brokers, factors, partners, or other persons does not create a fiduciary relationship for purposes of the bankruptcy law. *In re Drake*, 5 B.R. 149, 152 (Bankr.D.Idaho 1980) citing 3 *Collier on Bankruptcy* (15th Ed.) § 523.14. *See also In re Graham*, 7 B.R. 5, 7 (Bankr.D. Nev.1980). ("A trust clause inserted in a document which sets up a debtor-creditor relationship in an effort to assure the debtor's performance of its obligation does not create a trust. A fiduciary relationship requires a separate account".) *In re Williams*, 2 Collier Bankr.Cas. 2D(MB) 796 (Bankr.W.D.Va.1980) (Commission agent's failure to remit proceeds of sale was an unsecured debt on open account and not a fraud or defalcation while action in a fiduciary capacity).

The requirement that the debtor be acting in a fiduciary capacity has consistently been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very active wrongdoing out of which the contested debt arose. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). *See also In re Pedrazzini*, 644 F.2d 756, 758 (9th Cir.1981) (relationship must exhibit characteristics of the traditional trust relationship; the fiduciary duties must exist before the act of wrongdoing, and not as a result of the act of wrongdoing.) In every case in which the exception is invoked, there will have been a default. However, a trust relationship must exist prior to the act creating the debt. *In re Snyder*, 101 B.R. 822 (Bankr. D.Mass.1989); *Kwiat v. Doucette*, 81 B.R. 184 (Bankr.D.Mass.1987). Thus, the critical inquiry is the character of the relationship in which the default took place, and that inquiry must focus on the structure of the relation as it existed prior to the default. *In re Johnson*, 691 F.2d 249 (6th Cir.1982). *See In re San Juan Hotel Corp., supra*, 847 F.2d at 954 (exception applies only when debtor was acting as fiduciary before the debt was incurred).

In those cases where a consignee has been found to act in a fiduciary capacity courts have consistently held that the terms of the relationship require that the consignment proceeds be segregated and not available for the consignee's general use. *In re Sutton*, 39 B.R. 390, 394–395 (Bankr.M.D.Tenn.1984) citing *In re Wise*, 6 B.R. 867 (Bankr.M.D.Fla.1980) (fiduciary relationship did not exist since the debtor had sole access to the funds and could use said funds as long as he was able to make his weekly payments.)

In *In re Drake*, 5 B.R. 149 (Bankr.D.Idaho 1980) the debtor received motor vehicles on consignment and agreed to sell them at a fixed price which was remitted to the consignor. If he sold the vehicle for a greater amount, he was to keep the profit. As in the case at bar, there was no written consignment agreement. There was a receipt providing that debtor owed the owner the stipulated amount on the car which was to be sold. Drake did not segregate funds

received from sales or maintain a trust account. He placed them in his general business account. The court found no fiduciary relationship. "If there is an express agreement that the purchase price received from the sale of consigned property is to be held in trust, separate and apart, then and only then is a fiduciary relationship in the bankruptcy sense created." *Id.* at p. 152.

▆ Over a seven-year period, Waning was never instructed or required to segregate the money received from the sale of the inventory. He regularly commingled funds and failed to pay over receipts from inventory sales to satisfy his account with Wallingford's. Against such a background, a fiduciary relationship cannot be constructed. *See In re Sutton,* 39 B.R. 390 (Bankr.M.D.Tenn.1984). Although Wallingford's may have wished that it created an express trust arrangement with Waning, it did so neither in structure nor in practice. In the absence of an express trust relationship, a fiduciary relationship under § 523(a)(4) cannot be found.[12]

### 3. Wallingford's Claim is Not Excepted From Discharge Pursuant to Code § 523(a)(6).

Code § 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." "Willful and malicious injury" comprehends a willful and malicious conversion of property. *In re Singleton,* 37 B.R. 787, 792 (Bankr.D.Nev. 1984) (11 U.S.C. § 523(a)(6) encompasses substance of exception established by former Bankruptcy Act § 17(a)(2) that excepted debts for "willful and malicious conversion of the property of another.") *See also In re Iaquinta,* 98 B.R. 919 (Bankr.N.D.Ill. 1989) (sale of vehicles without substituting

titles or remitting proceeds to secured party was willful and malicious conversion); *In re Penning,* 22 B.R. 616 (Bankr.E.D. Mich.1982) (disposing of snowmobiles without accounting for the proceeds of sale in express violation of security agreement created a non-dischargeable debt under Code § 523(a)(6)).

At the outset, one cannot find on this evidence that there has been a willful and malicious conversion of "property of another entity." Having concluded that the arrangement between the parties was not that of a "true consignment" where absolute title to the goods remained with Wallingford's, the evidence fails to suggest that Wallingford's reserved any interest in the inventory after it was supplied to Waning.[13] There was no executed written security agreement; nor was there any other evidence that the parties intended Wallingford's to have a security interest in the inventory.[14]

▆ Moreover, conversion, for non-dischargeability purposes, requires a willful and malicious act which deprives an owner of his property permanently or for an indefinite period of time. *In re Valentine,* 104 B.R. 67 (Bankr.S.D.Ind.1988). Willful means deliberate or intentional. *In re Greig,* 21 B.R. 583 (Bankr.D.Me.1982). The conversion of another's property without his knowledge or consent, intentionally, without justification or excuse to the other's injury, is a willful and malicious injury within the meaning of Code § 523(a)(6). *In re Graham,* 7 B.R. 5 (Bankr.D.Nev.1980). Technical conversions often lack the elements of willfulness or maliciousness necessary to establish the exception from discharge. *In re Hodges,* 4 B.R. 513 (Bankr. W.D.Va.1980). As was the case under § 17(a)(2) of the Bankruptcy Act, a claim

---

12. In holding that Wallingford's has not carried the day with regard to the § 523(a)(4) claim, as well as with its § 523(a)(6) claim, we need not answer the question whether the appropriate burden of proof requires the plaintiff to prevail by a preponderance of the evidence or clearly and convincingly under those exceptions to discharge. *See In re Foreman,* 906 F.2d 123, 127–28 n. 8 (5th Cir.1990). Having failed to prevail by a preponderance, Wallingford's could not have met the higher standard.

13. *See supra* note 9 and accompanying text.

14. A security interest cannot attach until there is an agreement that it attach, 11 M.R.S.A. § 9–204. It is not enforceable until there exists, *inter alia,* a signed security agreement. 11 M.R. S.A. § 9–203(1)(b). Here, there is no writing and no evidence of even an oral security agreement.

founded on a mere technical conversion without conscious intent to violate the rights of another, and under mistake or misapprehension, is dischargeable. *In re Behr*, 42 B.R. 922, 925–26 (Bankr.E.D.Pa. 1984); *In re Conteto*, 37 B.R. 853, 854–55 (Bankr.S.D.N.Y.1984). *See Davis v. Aetna Acceptance Company*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (Bankruptcy Act case).

*Davis v. Aetna Acceptance Company, supra*, distinguishes between conversions which are willful and non-dischargeable, and those which are technical and dischargeable.

... [A] wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an authorized assumption or dominion without wilfulness or malice (cites omitted.) There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a wilful and malicious one. Turning to the findings here, we see that wilfulness and malice have been unmistakably excluded. 293 U.S. at 332, 55 S.Ct. at 153.

■ The record does not indicate that Waning knew or intended that his behavior in remitting delinquent payments to Wallingford's, or in paying personal expenses from an account which also contained the proceeds from sales of inventory would injure Wallingford's.[15] The parties had engaged in a course of dealing in which Waning routinely submitted late and insufficient payments for the inventory he sold. Plaintiff continued to deliver more inventory notwithstanding the substantial balances owing on Waning's account.

Based upon the facts and circumstances of this case, as established by the evidence, one cannot conclude that, even assuming that Wallingford's somehow retained an interest in the goods, Waning willfully and maliciously embarked on a course "substantially certain" to injure his supplier. *In re Cloutier*, 33 B.R. 18, 20 (Bankr.D.Me. 1983), *citing In re Donnelly*, 6 B.R. 19, 22 (Bankr.D.Or.1980). He may have breached an agreement to pay, but his conduct was not willful and malicious. The debt is not excepted from discharge under Code § 523(a)(6).

## CONCLUSION

Judgment is entered for the Defendant.

---

**15.** Much was made of Waning's use of sales proceeds for personal expenses, including making payments on some property he has claimed as exempt. In that regard, he appears to have done "business as usual," paying first the obligations of greatest moment to him. There is no evidence that such use of business receipts was anything other than what he had always done. The difference here is that, ultimately, he was not able to meet all of his creditors' demands soon enough to avert financial calamity.