In re Jack R. BROWN, Debtor.

Normand R. LaPOINTE, on Behalf of
BROWN & LaPOINTE DEVEL-
OPMENT, INC., Plaintiff,

v.

Jack R. BROWN, Defendant.

Bankruptcy No. 90–10164.
Adv. No. 90–1032.

United States Bankruptcy Court,
D. Maine.

Sept. 19, 1991.

Donald H. Marden, Marden, Dubord, Bernier & Stevens, Waterville, Me., for Jack R. Brown.

Stanley F. Greenberg, Greenberg & Greenberg, Portland, Me., for Normand R. LaPointe.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

Before the court is the verified complaint of Normand R. LaPointe ("LaPointe"), on behalf of Brown & LaPointe Development, Inc. ("B & L"),[1] seeking to establish that debts owed to B & L by the debtor, Jack R. Brown ("Brown"), are non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

This is a core proceeding over which this court has jurisdiction under 28 U.S.C. § 157(b)(2)(I). This memorandum sets forth the court's findings of fact and conclusions of law.[2]

### Findings of Fact

LaPointe and Brown have been acquaintances for over twenty years. Before 1988, Brown sold real estate, managed apartments, built homes, and sold small equip-

---

**1.** *See* F.R.Bankr.P. 7023.1. This memorandum treats B & L as the plaintiff.

**2.** *See* F.R.Bankr.P. 7052.

ment. He routinely did business at La-Pointe's lumber yard. However, their relationship went beyond the conventional business association. LaPointe, an established and successful businessman, took an interest in Brown's fortunes and assisted him financially. In the early 1980's LaPointe guaranteed a loan for Brown, enabling him to acquire a small equipment dealership franchise. In 1987 LaPointe sold Brown land on Stevens Road in Augusta, Maine on which Brown and his wife planned to build their residence and a second house to be offered for sale.[3]

In June 1988, Brown and LaPointe agreed to purchase and develop real estate known as Mudgett Hill in Vassalboro, Maine. Although they commenced the venture before incorporating, B & L was formed to carry out the project. Initially they intended to construct two residential homes, and, after their sale, to invest the return in additional building and development activities. The two agreed that, ultimately, B & L's profits would be divided evenly between them.

Brown and LaPointe agreed that B & L would purchase construction materials and supplies from LaPointe's lumber yard. Brown contributed approximately $10,000.00 as start-up capital. LaPointe, whose credit was essential to obtaining bank financing, contributed no cash to the venture, but agreed to guaranty B & L's bank loans. LaPointe made it clear that he had no time for involvement with the business's day-to-day operations. Brown was given complete operational control. He secured the required permits, supervised construction and kept the corporate books.

B & L obtained a $250,000.00 line of credit commitment from Augusta Federal Savings Bank ("Augusta Federal"). The credit line, to be used exclusively for B & L's activities, was secured by a mortgage on the Mudgett Hill property. On September 23, 1988, the bank funded the line of credit. Brown was B & L's contact with Augusta Federal. He and his wife had signing authority for corporate checks and, at Brown's direction, either of them could request bank drafts or fund transfers to the B & L checking account. Thus, Brown was entrusted to hold and manage B & L's business assets and to utilize them and B & L's credit fund to carry out corporate activities.

During the period that B & L undertook the Mudgett Hill development, Brown's other business commitments strained his personal finances. He completed his Stevens Road residence late in 1987 and was building a second house on the adjacent lot. His obligation to LaPointe for purchase of the Stevens Road parcel was not yet satisfied; he and his wife were expanding a floral business; and he undertook renovations of several rental properties he owned.

In March of 1989 Augusta Federal authorized a $50,000.00 increase to the B & L line of credit.[4] At about the same time, B & L purchased property located on Hunt Road in Vassalboro. It established a $100,000.00 line of credit and a business checking account with Fleet Bank ("Fleet") to finance acquisition and development of the Hunt Road property.

From the corporation's checking accounts funded by the lines of credit Brown regularly wrote checks for a variety of expenses. Some related directly to B & L's development activities. Many did not. Brown regularly applied funds drawn from the lines of credit, through the corporate checking accounts at Augusta Federal[5]

---

3. LaPointe financed the sale without a mortgage or other security.

4. LaPointe was informed of and agreed to the increase.

5. B & L asserts that Brown drew the following checks on the corporate account at Augusta Federal to pay personal expenses:

| Check # | Amount | Payee |
| --- | --- | --- |
| AFSB Account | | |
| 106 | 682.45 | Hussey Hardware |

and Fleet[6] to personal expenses. Brown also drew on corporate funds to pay $9,118.25 for excavation work at the Stevens Road residence; $3,500.00 for electrical work there; $756.00 for plumbing work at Stevens Road; $658.35 for concrete used at Brown's residence; and $3,550.00 to reimburse himself for the cost of insulating his home.

In addition, during the course of Mudgett Hill construction, Brown engaged in kick-back schemes with two contractors, Peter Brown and Bob Burns, diverting corporate funds to his own account. He also took for himself a total of $1,658.81 paid by John Nored for wood cut and removed from the Mudgett Hill property; paid himself salary from B & L's funds; and, having failed to remit withholding taxes, left B & L with $4,830.85 in tax liabilities.

Although the facts of the transactions are uncontested, Brown defends claiming

| Check # | Amount | Payee |
|---|---|---|
| 107 | 1,519.82 | Zimba, Co. |
| 108 | 3,000.00 | Jerry Chase |
| 115 | 1.422.00 | Currier Shelving |
| 119 | 645.00 | Waterworks |
| 120 | 450.00 | Riverside Floral |
| 124 | 130.90 | Mobil Oil |
| 125 | 363.32 | Central Plate Glass |
| 129 | 1,222.35 | AFSB |
| 144 | 148.20 | Mobil Oil |
| 146 | 250.00 | J. Brown |
| 148 | 158.00 | Priscilla Brown |
| 149 | 978.34 | AFSB |
| 170 | 185.25 | Servicemaster |
| 184 | 500.00 | Cash (travel) |
| 199 | 675.00 | Riverside |
| 203 | 184.15 | Gold Card |
| 204 | 159.30 | Mobil Oil |
| 215 | 140.00 | J. Brown |
| 272 | 327.80 | GMAC |
| 287 | 327.80 | GMAC |
| 297 | 118.97 | Mobil Oil |

6. B & L alleges that the following payments were drawn on the corporate account at Fleet to pay for Brown's personal expenses.

| Check # | Amount | Payee |
|---|---|---|
| Fleet Bank Account | | |
| | 1,000.00 | Dan Bailey |
| | 439.87 | Hydro–Repair Inc. |
| 105 | 481.27 | Maine Instrument Flight School |
| 107 | 935.50 | Small's Truck Service |
| 111 | 800.00 | Carl Cote |
| 113 | 151.29 | Basket Buys |
| 118 | 1,000.00 | Williston Mosher |
| 120 | 320.05 | Clark Marine |
| 125 | 186.24 | Northeast |
| 128 | 1,500.00 | Williston Mosher |
| 129 | 22.31 | Williston Mosher |
| 137 | 119.00 | Genesis Landscaping |
| 136 | 80.00 | Bill Perry |
| 141 | 21.37 | CMP |

that some expenses were for corporate purposes, that most were "authorized" by B & L, and that, although he paid some personal expenses with corporate funds, the requisites of § 523(a)(4) non-dischargeability have not been proved.

### Conclusions of Law

**1. The Legal Standard.**

At issue is whether Brown is obligated to B & L as a consequence of his use, or misuse, of corporate assets and, if so, whether the obligations are excepted from discharge by § 523(a)(4), which provides that debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny ..." will not be discharged. The determinative issue is whether Brown's conduct constituted "defalcation in a fiduciary capacity." [7]

#### a. *Burden of Proof.*

B & L must prove the elements of a § 523(a) exception to discharge by a preponderance of the evidence. *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

#### b. *Defalcation.*

■ The concept of "defalcation" is broad. Under § 523(a)(4), it comprehends the slightest misconduct, negligence or ignorance; it does not require intentional wrongdoing. *In re Reeves*, 124 B.R. 5, 6 (Bankr.D.N.H.1991); *In re Boshell*, 108 B.R. 780, 783–84 (Bankr.N.D.Ala.1989); *In re Burgess*, 106 B.R. 612, 621 (Bankr. D.Neb.1989). *See also Central Hanover Bank and Trust Co. v. Herbst*, 93 F.2d 510 (2nd Cir.1937); *In re Gans*, 75 B.R. 474, 490 (Bankr.S.D.N.Y.1987) (defalcation is broadly defined to include a fiduciary's failure to account for money he received in his fiduciary capacity regardless of the fact that such failure may have resulted from ignorance or negligence).

#### c. *Fiduciary Capacity.*

■ Although the notion of defalcation is expansive, embracing innocent conduct, § 523(a)(4)'s discharge exception is narrowly limited by the requirement that the defalcation take place "in a fiduciary capacity." *See In re Gans*, 75 B.R. at 490. Thus, whether Brown's relation to B & L was imbued with the fiduciary character necessary to cast the debts occasioned by his defalcations non-dischargeable becomes critical.

The classic notion of a fiduciary is that of one who undertakes to act disinterestedly in his beneficiary's best interest. *In re Waning*, 120 B.R. 607, 612 n. 9 (Bankr. D.Me.1990). However, the traditional definition is far broader than that which must be shown to invoke successfully 11 U.S.C. § 523(a)(4). *In re Reeves*, 124 B.R. at 9; *In re Waning*, 120 B.R. at 614. The qualities of "fiduciary capacity" for purposes of § 523(a)(4) are defined by federal law. *Id.* The content of federal law is informed by principles articulated in state law, including those that define essential attributes of a trust relationship. *See Carlisle Cashway, Inc. v. Johnson*, 691 F.2d 249, 251 (6th Cir.1982); *In re Kern*, 98 B.R. 321, 323 (Bankr.S.D.Ohio 1989).

■ A fiduciary relationship within the meaning of underlying state or federal law is necessary to create "fiduciary capacity" for purposes of § 523(a)(4), *In re Lane*, 937 F.2d 694, 699 (1st Cir.1991) (absence of state law fiduciary relationship fatal to discharge objection); however, it is not sufficient. *In re Reeves*, 124 B.R. at 9. *See In re Cairone*, 12 B.R. 60, 62 (Bankr. D.R.I.1981). The required "fiduciary capacity" that triggers the discharge exception is found only in circumstances constituting a technical or express trust. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Reeves*, 124 B.R. at 9; *In re Waning, supra*.

---

**7.** Section 523(a)(4)'s alternative grounds for nondischargeability, "larceny" and "embezzlement," are satisfied, as well, with regard to at least one transaction. *See infra* n. 12.

■ Here, although it cannot be questioned that, in a general state law sense, Brown was a corporate fiduciary,[8] one must look further to ascertain whether the relationship was imbued with attributes giving rise to, in substance, a trust. Characteristics of an express trust include an explicit declaration of the creation of a trust, a clearly defined trust res, and an intent to create a trust relationship. *In re Reeves,* 124 B.R. at 9, citing 89 C.J.S. *Trusts* § 22, at 734–35; *In re Boshell,* 108 B.R. at 782–83; *In re Cairone,* 12 B.R. at 62.

■ As the sole, active officer of B & L, Brown, who agreed to keep the books of the corporation, to administer the line of credit and to manage the checking accounts, was entrusted with B & L's assets. Among Brown, LaPointe and B & L, the intent to create a trust relationship was clear. Brown undertook to use the corporation's resources solely for advancement of the corporation's interests, not for personal gain. Given Brown's unfettered control of and access to its assets, his relationship to B & L was in substance no different than that of a trustee to its trust, a guardian to its ward.[9]

8. *See Rosenthal v. Rosenthal,* 543 A.2d 348, 352 (Me.1988) (discussing duties of corporate fiduciaries); *Atlantic Acoustical & Insulation Co. v. Moreira,* 348 A.2d 263, 267 (Me.1975) (corporate officer stands in fiduciary relationship to corporation).

9. *Cf. In re Cross,* 666 F.2d 873, 879 (5th Cir. 1982), where the Fifth Circuit, applying the Bankruptcy Act, commented that while some debts of officers to their corporations were dischargeable, others were not:

The lower courts did not consider whether § 17(a)(4) also requires that the bankrupt owe a fiduciary duty to the claimant that exists prior to and independent of the alleged misconduct, *as would be the case where a corporation seeks to hold its own bankrupt officer accountable for his misappropriation or defalcations of corporate funds* (i.e., whether § 17(a)(4) applies to officers only when their corporation or other fiduciary beneficiary is the claimant.) (Emphasis added.)

Not every breach of fiduciary duty constitutes defalcation "while acting in a fiduciary capacity" for purposes of § 523. *See In re Hammond,* 98 F.2d 703, 705 (2d Cir.1938) (corporate director held to be "acting as an officer or in any fiduciary capacity" under the Bankruptcy Act when he purchased and sold stock which the corporation had contracted to purchase); *Harper v. Rankin,* 141 F. 626 (4th Cir.1905), *cert. denied,* 200 U.S. 621, 26 S.Ct. 758, 50 L.Ed. 624 (1906). ($2.5 million debt created by a bank vice-president who made unauthorized loans to corporations in which he had an interest excepted from discharge under § 17(a)(4) of the Bankruptcy Act). *Cf. In re Kern,* 98 B.R. at 323 (guardian of estate acted in fiduciary capacity). *But see In re Reeves,* 124 B.R. at 9–10 (discussing partners as fiduciaries and the discharge exception); *In re Hutton,* 117 B.R. 1009 (Bankr. N.D.Okl.1990) (director did not act in fiduciary capacity when he voted to approve stock purchase because fiduciary duties did not arise out of express, technical or statutory trust); *In re Holmes,* 117 B.R. 848, 852–53 (breach of statutory trust, as opposed to technical trust, does not give rise to discharge exception).

## 2. Applying the Standard.

### a. *Personal Expenses.*

■ Brown is liable to the corporation for the debts he incurred when he appropriated corporate assets to pay personal expenses. The obligations result from defalcations while acting in a fiduciary capacity and are therefore excepted from discharge under § 523(a)(4). It is without import that Brown may somehow have believed he had the "authority" to pay such expenses with corporate funds, that he may have intended to repay the corporation at a future time, or that LaPointe may have had the opportunity to discover and to object to Brown's actions. Defalcation exists where a debtor has misapplied property or funds entrusted to him, even under a mistaken belief that he was authorized to do so. *In re Burgess,* 106 B.R. at 621; *In re Levitt,* 18 B.R. 598, 602 (Bankr.C.D.Pa.1982). Any such belief clearly was mistaken here.

Brown's explanations and justifications for his actions are, for the most part, unbelievable. That B & L, a corporation without cash flow, would authorize Brown not only to draw a salary, but also to use its funds to complete construction of his personal residence, to pay his home and car loans, to pay his credit cards and to provide cash for undefined "travel" expenses, strains credulity too far.[10]

10. Brown attempts to explain away some of the payments by arguing that, once the line of credit was funded, he could recover the working capital he previously paid in to the corporation. The assertion is belied, among other things, by

Excluding the office "rent" and "salary" payments, discussed below, Browns fiduciary defalcations resulted in a debt to B & L in the amount of $37,132.25.[11]

b. *Kick–Back Payments.*

■ At Brown's insistence, Peter Brown and Bob Burns Construction, contractors working at Mudgett Hill, inflated their bills to B & L. Bob Burns Construction added $1,000.00 in labor costs to its invoice. B & L paid the "corrected" invoice in full. About one week later, Bob Burns wrote a check to Brown for $1,000.00 on account of the "overpayment."

Jack Brown also requested that Peter Brown mark up his invoices. After receiving $21,000.00 in payment of inflated bills, Peter Brown wrote checks back to Jack Brown. Brown admits that he wrongfully obtained at least $9,000.00 of corporate funds in this fashion.

Such conduct clearly amounts to defalcation while acting in a fiduciary capacity. The resulting $10,000.00 obligation will not be discharged.

c. *Nored Checks.*

■ Brown also appropriated $1,658.81 paid to him by John Nored for wood cut and removed from corporate lands. He acknowledged that, after clearing property, Nored tendered checks to him in payment for the wood he removed.

Brown claimed he cashed Nored's checks and paid one-half of the proceeds to LaPointe. LaPointe denies receiving the money. The court discredits Brown's version of events and finds that Brown kept this money, rightfully the corporation's, and put it to his own uses. The debt will not be discharged.[12]

d. *Office Rental.*

■ Brown paid $1,125.00 to Riverside Floral, a business he and his wife owned, ostensibly to rent an office on the premises for B & L. There were only two such payments.[13] The court finds there was no bona fide office lease, let alone an authorized lease. The "rental" payments represent yet another abuse of Brown's fiduciary position to appropriate the funds entrusted to his case. The debt will not be discharged.

e. *Salary.*

■ B & L asserts that Brown paid himself an unauthorized salary from corporate funds. Brown testified that he understood he was authorized to take a salary as compensation for managing corporate activities, including the developments on Mudgett Hill and Hunt Road.

With few exceptions, Brown drew a weekly salary from the corporation from the outset.[14] Initially B & L paid him $500.00 weekly. Brown later increased his gross salary to $650.00, so that he netted

the fact that the expenditures quickly outstripped his initial capital contribution. Such withdrawals were not authorized in fact. They were not permitted by law. *See* 13–A M.R.S.A. § 501 *et seq.* (corporate finance).

**11.** The total is comprised of the sum of the Augusta Federal checks (less checks numbered 120 and 199—office rent) set forth *supra* n. 3; the sum of Fleet Bank checks listed *supra* n. 4; and bank draft payments for Stevens Road excavation work (O.D. Lee); Stevens Road electrical work (D.W. Brown); Stevens Road plumbing (J. Boivin); Stevens Road concrete (Williams Construction); and for reimbursement of Stevens Road insulation expenses.

**12.** The timber on corporate lands was a portion of the assets entrusted to Brown. Appropriating Nored's stumpage payment also constituted "embezzlement" within the meaning of § 523(a)(4). *See, e.g., In re Littleton,* 106 B.R. 632, 639 (9th Cir.BAP 1989) aff'd 931 F.2d 897 (9th Cir.1991); *In re Crook,* 13 B.R. 794 (Bankr. D.Me.1981).

**13.** *See* checks 120 ($450.00), 129 ($675.00), *supra* n. 5.

**14.** The following Augusta Federal checks evidence weekly salary payments to Brown:

| Date | Check No. | Amount |
|------|-----------|--------|
| 07/28/88 | 104 | $500.00 |
| 08/05/88 | 109 | 500.00 |
| 08/12/88 | 110 | 500.00 |
| 08/18/88 | 116 | 500.00 |

approximately $500.00 after deductions. Starting about May 25, 1989, Brown drew funds from B & L irregularly and in varying amounts.[15]

| Date | Check No. | Amount |
|---|---|---|
| 08/28/88 | 118 | $500.00 |
| 08/31/88 | 121 | 500.00 |
| 09/08/88 | 123 | 500.00 |
| 09/16/88 | 132 | 500.00 |
| 09/30/88 | 138 | 500.00 |
| 10/08/88 | 147 | 497.69 |
| 10/13/88 | 154 | 497.69 |
| 10/21/88 | 155 | 497.69 |
| 10/28/88 | 159 | 497.69 |
| 11/04/88 | 163 | 499.29 |
| 11/09/88 | 179 | 499.29 |
| 11/19/88 | 185 | 499.29 |
| 11/25/88 | 195 | 499.29 |
| 11/30/88 | 202 | 499.29 |
| 12/09/88 | 209 | 499.29 |
| 12/16/88 | 220 | 499.29 |
| 12/22/88 | 222 | 499.29 |
| 12/29/88 | 223 | 499.29 |
| 02/04/89 | 252 | 499.29 |
| 02/10/89 | 254 | 499.29 |
| 03/10/89 | 268 | 499.29 |
| 03/17/89 | 271 | 499.29 |
| 03/24/89 | 277 | 499.29 |
| 03/30/89 | 281 | 499.29 |
| 04/07/89 | 284 | 499.29 |
| 04/07/89 | 285 | 499.29 |
| 04/21/89 | 288 | 499.29 |
| 04/29/89 | 289 | 499.29 |
| 05/06/89 | 294 | 499.29 |
| 05/09/89 | 295 | 499.29 |
| 05/10/89 | 302 | 499.29 |
| 05/25/89 | 303 | 499.29 |
| | | $17,974.43 |

15. Brown testified that the following checks written on the corporation's account at Fleet were for salary or personal expenses:

| Date | Check No. | Amount |
|---|---|---|
| 05/25/89 | 103 | $ 250.00 |
| 06/01/89 | 106 | 300.00 |
| 06/16/89 | 115 | 1,500.00 |
| 06/21/89 | 117 | 200.00 |
| 06/28/89 | 119 | 100.00 |
| 07/21/89 | 126 | 150.00 |
| 07/28/89 | 127 | 100.00 |
| 08/11/89 | 132 | 100.00 |
| 08/16/89 | 133 | 100.00 |
| 08/22/89 | 134 | 100.00 |
| 08/24/89 | 135 | 200.00 |
| 08/29/89 | 138 | 75.00 |
| 09/01/89 | 139 | 250.00 |
| 09/08/89 | 142 | 200.00 |
| 09/15/89 | 144 | 250.00 |
| | | $3,875.00 |

Although LaPointe confronted Brown about irregularities in B & L's finances in the spring of 1989, he and B & L permitted Brown to continue to run the business, and to take a salary, for a time.[16] According to LaPointe, whose testimony is unclear on this point, he "took over" the corporation's affairs in "summer or fall" of the year.

As the active managing principal of B & L, Brown was authorized to receive salary payments at a reasonable level. LaPointe has not contended that the amount B & L paid Brown as salary was unreasonable and has introduced no evidence to show that the value of Brown's services was less than he was paid. Moreover, LaPointe and B & L permitted Brown to continue to take a salary for a period after they came to suspect kick-backs and personal expense payments, thus eliminating any argument that authority to take a salary terminated prior to the last regular salary check Brown took.[17]

■ After May 25, 1989, corporate checks written to Brown issued irregularly, in widely varying amounts,[18] and were drawn against Fleet, rather than Augusta Federal. Brown could only say that the post-May 25 checks were for "salary or personal expenses." By May 25, LaPointe clearly had made known his dissatisfaction with Brown's activities and any previously granted authority to take a salary was revoked. Brown's change in salary payment practices from May 25 forward evidence his knowledge that a salary was no longer authorized and his intention to circumvent the prohibition. Such action constitutes defalcation while acting in a fiduciary capacity.

Thus, although Brown has no obligation to repay the $17,974.43 in salary he drew prior to May 25, 1989, he is obligated, and shall remain obligated, to repay the $3,875.00 he drew from the Fleet account from that date forward.

### f. Withholding Taxes.

■ From twenty-seven salary checks Brown caused B & L to "withhold" $4,069.17 against state and federal tax liabilities. Although the withholdings were "booked," funds were never set aside. As a consequence, B & L owed taxing authorities at least $4,069.17 in payroll taxes when LaPointe took over.[19]

At issue here is not the dischargeability of Brown's personal liability for unpaid withholding taxes. *Cf. In re Coleman,* 19 B.R. 529 (Bankr.D.Kan.1982) (holding 100% penalty assessed against "responsible person" is not dischargeable). The question is whether Brown is obliged to pay B & L the $4,069.17 owed because he failed to segregate and pay over withholding taxes while he had the responsibility to do so and, if so, whether the obligation is non-dischargeable.

There is no direct evidence whether funds were available to make the withholdings at the time liability accrued. However, because the corporation continued to expend funds throughout the relevant period, one must conclude that it had the ability to fund its withholding tax obligations. Brown simply failed to set the money aside.

Although it has been held that a corporate officer's failure to withhold and pay taxes constitutes a debt for defalcation while acting in a fiduciary capacity,[20] such

---

**16.** The upshot of one meeting, held at LaPointe's lumber yard office, was Brown's assurance that he would "take care of things" and LaPointe's agreement to leave him in office.

**17.** *Cf.* Restatement (Second) of Agency § 112 (termination of authority upon serious breach of loyalty or acquisition of adverse interest.)

**18.** *See* n. 15 *supra.*

**19.** The $4,069.17 figure is the total of withholdings booked but never made. Additional tax

obligations likely accrued when salary was paid to Brown without even acknowledging the obligation to withhold. *See* text at nn. 14–15, *supra* and 26 U.S.C. §§ 3102(a); 3401 *et seq.*

**20.** *See In re Twitchell,* 72 B.R. 431, 436 (Bankr. D.Utah 1987) (finding non-dischargeability without discrete analysis of unpaid withholding taxes), *rev'd,* 91 B.R. 961 (D.Utah 1983), *rev'd,* 892 F.2d 86 (10th Cir.1989). *See also In re Boshell,* 108 B.R. at 784.

a finding is not appropriate on these facts. For one thing, B & L owes the taxes on salaries actually paid in any event.[21] For another, there is simply no evidence of funds earmarked for taxes being removed from the tax trust and applied elsewhere. Finally, assuming funds that could have been paid over to taxing authorities were misspent on, among other things, personal expenses, Brown will be called to answer for them.[22]

B & L must ultimately deal with its withholding tax liabilities. Brown must repay the funds he misappropriated to his own ends. But even assuming Brown's failure to pay the taxes leads to his personal liability to the corporation, the record does not sustain the conclusion that Brown should be denied a discharge of that liability.

B & L is entitled to judgment against Brown for the following amounts:

1. Personal Expenses Paid With Corporate Funds: $37,132.25
2. Kick–Back Payments 10,000.00
3. Nored Payments 1,658.81
4. Office Rental 1,125.00
5. Unauthorized Salary 3,875.00
   $53,791.06

Brown's $53,791.06 debt to B & L is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

Judgment will be entered accordingly.

---

**21.** Of course, Brown's failures may have caused B & L to owe additional amounts in interest and penalties. However, there is no evidence as to what, if any, increase in tax liability B & L faced as a result of delayed payment.

**22.** Indeed, to the extent that wrongful expenditures of corporate funds were the reason that B & L's taxes went unpaid, to deny a discharge on account of the unpaid taxes could lead to double recovery.