In re Maria Louise **NICHOLS**, Debtor.

**DEPOSITORS TRUST COMPANY OF EASTERN MAINE**, Plaintiff,

v.

**Maria Louise NICHOLS**, Defendant.

**Bankruptcy No. 180–00113.**
**Adv. 180–0064.**

United States Bankruptcy Court, D. Maine.

Oct. 30, 1980.

quests for extension of time to file complaints objecting to discharge and/or dischargeability, see *In re Lee, supra.*

Robert E. Sutcliffe, Rudman & Winchell, Bangor, Maine, for plaintiff.

Phillip L. Ingeneri, Bangor, Maine, for debtor/defendant.

## MEMORANDUM OPINION

CONRAD K. CYR, Bankruptcy Judge.

Depositors Trust Company of Eastern Maine [Depositors] requests a determination as to the dischargeability of an automobile loan indebtedness. On or about July 18, 1979, the debtor applied for an obtained approval of a $500 creditline account, a checking account overdraft privilege. Approximately one week later, the debtor obtained approval of a $500 increase in the creditline account. Within a few days, the debtor approached the same bank officer for a $4,650 loan with which to purchase a 1979 Oldsmobile Cutlass and presented a Buyers Order placed with Beacon Cadillac Olds & Jeep [Beacon]. The debtor informed the bank officer that she intended to use the loan proceeds to purchase the Cutlass, and the loan was approved. On or about July 30, 1979, the debtor executed a note and a security agreement granting Depositors a purchase–money security interest in the Cutlass. The debtor received a treasurer's check for $4,650 payable to her and Beacon, left the bank and returned shortly thereafter with a request to the same loan officer that a replacement check be issued in her name only. The loan officer accommodated the request and the debtor left with a treasurer's check for $4,650 payable to her alone.

The debtor did not purchase the Cutlass, nor did she ever make any payments on the note. Depositors later recovered a $5,998 state court judgment which remains unsatisfied, representing $4,929.06 due under the automobile loan, together with interest and costs, as well as a $993.92 balance due on the creditline account. The debtor filed a voluntary chapter 7 petition on April 8, 1980. Depositors maintains that its automobile loan balance is not dischargeable under Bankruptcy Code § 523(a)(2)(A).

The other salient circumstances are in dispute. The debtor testified that she went to Beacon before submitting her written application for the automobile loan, and selected a certain 1979 Oldsmobile Cutlass, then on sale. She executed a Buyer's Order for the Cutlass in the presence of Robert

Campbell, a Beacon salesman, but made no deposit. The debtor presented the Buyer's Order to Clinton Higgins, a loan officer with Depositors, executed the loan application and left the bank. The loan application was approved. She returned to the bank and executed a 'Security Agreement Chattel Mortgage Note.' Higgins delivered to the debtor a $4,650 treasurer's check jointly payable to Beacon and the debtor. The debtor left the bank and went immediately to Beacon, where she spoke with Robert Campbell who advised her that the Cutlass had been sold. There was some brief discussion about the purchase of another vehicle, but no sale was consummated.

The debtor returned to the bank and advised Higgins that she could not get the Cutlass and that she needed a check made payable to her alone in order to permit her to buy another car. Higgins accepted the return of the joint treasurer's check and tendered one payable to the debtor, which the debtor accepted and deposited in a savings account at another bank. The debtor later purchased a 1974 Firebird automobile, using $2,200 of the loan proceeds, without advising Depositors. The remaining proceeds were used to pay old bills and living expenses.

Depositors' version of the circumstances differs radically. Higgins testified that the debtor advised him that she wanted to purchase a 1979 Oldsmobile Cutlass, whereupon he prepared a loan application and reviewed it in accordance with interbank lending guidelines, which indicated to him that the debtor was eligible for such a loan, but only on a secured basis. After evaluating the loan application, Higgins notified the debtor that the loan had been approved, at which time the debtor again expressed her intention to purchase the Cutlass. Higgins prepared and caused the debtor to execute the 'Security Agreement Chattel Mortgage Note,' and tendered a treasurer's check jointly payable to Beacon and the debtor.

The debtor returned the same day and advised Higgins that she could not cash the check, that she had already paid Beacon with her own personal check on the previous Friday, and that she needed a check made out to her alone. Higgins, by his own admission, made no effort to call Beacon (a local call) to verify her representations, but promptly delivered a treasurer's check payable to the debtor alone.

Higgins became aware in mid–September that the loan was in default. He tried to locate the debtor at the telephone number given on the loan application, without success. He tried to locate the debtor at 135 Grove Street, the residence listed on each of the loan applications, but could locate no such address. A Depositors collection officer verified that their joint efforts to locate 135 Grove Street had been unsuccessful.

Approximately one month later, Higgins and the collection officer located the debtor at her place of employment. There the debtor informed them that she had not purchased the Cutlass or any other car. The debtor advised them that she was going through bankruptcy and that they should speak with her attorney. According to Higgins and the collection officer, this was the first time they knew that Depositors had been duped into making a purchase–money loan for an automobile that was never purchased, but they made no inquiry into the circumstances surrounding the failure of the debtor to purchase the Cutlass.

The salesman testified that the 1979 Oldsmobile Cutlass was in stock at the time the Buyer's Order was executed by him on behalf of Beacon, that the debtor expressed an intention to obtain a loan with which to purchase the Cutlass; that the vehicle was sold to someone else by another salesman between July 26 and July 30, 1979, the date on which the debtor obtained the loan proceeds from Depositors. Campbell verified that the debtor came to him on or about July 30 with a check made jointly payable to her and Beacon with which to purchase the Cutlass.

The debtor testified that there was indeed an address known and clearly marked as 135 Grove Street, that it is located on the corner of Garland and Grove Streets, and that the number 135 is conspicuously displayed on the front door. She reiterated

that she was still living at 135 Grove Street during the middle of September, when Higgins and the collection officer tried to locate her there.[1]

The debtor explains her failure to make any loan payments as the result of suddenly shattered financial expectations. At the time she borrowed the money, she anticipated that the modeling agency she was operating would soon merge with another firm and that she was also about to become involved in the operation of a new health spa. She states that the loan proceeds left after the purchase of the 1974 Firebird were used to pay old debts and living expenses, because her income was abruptly and substantially reduced shortly after obtaining the car loan. She took employment at a local hardware store, where Depositors located her, because her modeling agency had failed and her expectations regarding the health spa had not materialized. She admits to having made no effort to advise Depositors that she purchased the 1974 Firebird with the loan proceeds, professing a lack of awareness that Depositors should expect her to do so.

In order for Depositors to sustain its burden of proof under Bankruptcy Code § 523(a)(2)(A) it must establish by a fair preponderance of clear and convincing evidence that the debtor obtained the loan by false pretenses, a false representation, or actual fraud, with the present intention of deceiving Depositors. *In re Capelli,* ¶ 67,-622 CCH Bankr.L.Rep. (D.R.I.1980). The case turns on whether the return by the debtor of the treasurer's check jointly payable to Beacon and the debtor was accompanied by conduct, pretenses or representations by the debtor, such as would contravene Bankruptcy Code § 523(a)(2)(A), intended to induce Depositors to reissue the treasurer's check in order to enable the debtor to divert the application of the loan proceeds from the agreed purposes.

Exceptions to the operation of a discharge should be strictly construed. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 543 (W.D.Va.1967). Section 523(a)(2)(A) contemplates proof of actual, as opposed to, implied fraud, see 124 Cong.Rec.H 11,089 (remarks of Rep. Don Edwards) (daily ed. Sept. 28, 1978), as was the case under pre–Code case law, see, e. g., *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1877).

Depositors has failed to sustain its burden of proof. The first element to be established is that the loan was obtained by false pretenses, a false representation, or actual fraud. In order to satisfy that burden the suspect conduct must be shown to have been knowingly and fraudulently perpetrated by the debtor, and relied upon by Depositors. 3 *Collier on Bankruptcy,* ¶ 523.08 (15th ed. 1980). The culpable conduct principally relied upon here is the representation that the loan proceeds would be used by the debtor to purchase the Cutlass in which Depositors retained a security interest. The debtor admits such a representation and the Buyer's Order and security agreement confirm it, but there is no evidence that the debtor either then knew she could not buy the Cutlass or that she then intended not to buy the Cutlass. The evidence is altogether consistent with the representations of the debtor in those respects. The salesman corroborates the debtor's pre–loan purchase negotiations with Beacon, her post–loan purchase attempt, and the presence of the Cutlass in, and its later sale from, Beacon's inventory. These facts substantiate, rather than contradict, a contemporaneous intention on the part of the debtor to purchase the vehicle. Misrepresentations made after the loan proceeds were obtained do not affect the dischargeability of the debt. 3 *Collier on Bankruptcy,* ¶ 523.08 (15th ed. 1980).

---

1. Neither party offered evidence which would enable the court to determine with certainty whether 135 Grove Street is a fictitious or an actual address. The court is satisfied, in these circumstances, that the failure to do so, after the debtor gave a detailed description of 135 Grove Street, its location, and her occupancy, warrants a finding that the debtor did reside at 135 Grove Street.

The fact is that it is the reprehensible conduct of the debtor *after* receipt of the loan proceeds which weighs against her. She disposed of the loan proceeds for purposes very different from her stated intentions at the time she obtained the loan. What is more, she never looked back, either to protect Depositors with a security interest in the 1974 Firebird, to surrender the treasurer's check, or to surrender the balance of the proceeds. The ultimate abuse was that the debtor did not make a single payment to Depositors, not even from the loan proceeds themselves, some of which remained unexpended for some time after loan payments were to have commenced.

There is no direct or circumstantial evidence whatever that the debtor did not intend, either *at the time she applied for the loan or when she received the loan proceeds,* to repay the loan or to purchase the Cutlass. Depositors presented no evidence to rebut the debtor's description of her business activities before and after the automobile loan, nor was there evidence to contradict her account of an abrupt decline in income shortly after obtaining the loan. Instead, Depositors would have the court sustain its position on the strength of the testimony of the loan officer responsible for approving the loan and for releasing the treasurer's check in the name of the debtor alone, under circumstances in which Depositors' interbank guidelines permitted him to approve only a secured loan. A careful comparison of the testimony of the loan officer with that of the debtor is instructive.

The debtor insists that upon returning to the bank she informed Higgins, then busy at a teller's window, that she had not been able to get the Cutlass, that Beacon was attempting to locate another car, and that she needed a check made out to her with which to purchase another car. She categorically denies ever telling Higgins that she had already paid for the Cutlass with her own check. If the testimony of the debtor correctly describes her conduct, there was no false pretense, false representation or fraud. The debtor did purchase another car and she paid for it with the loan proceeds.

On the other hand, Higgins insists that the debtor told him, upon returning to the bank with the joint treasurer's check, that she had already paid for the Cutlass with her own check, and that she intended to deposit the loan proceeds in her checking account. The court does not find colorable the contention that a loan officer, having very recently approved two separate checking account overdraft applications totaling $1,000, would not question a representation that the same borrower had issued a $4,650 check in payment for a new automobile. One cannot easily restrain skepticism at the suggestion that a loan officer would not at least have inquired of the debtor as to why she left the bank the first time with the joint treasurer's check when she knew she needed a check in her name alone. The fact is that the debtor's departure and return with the joint check tends to corroborate her testimony, which is independently corroborated by the Beacon salesman, that she did not know that the Cutlass was no longer available for sale until she went to Beacon, joint check in hand. Finally, all of the evidence before the court establishes unequivocally that Higgins released the treasurer's check payable to the debtor alone without so much as an attempt to verify with the seller or the debtor what Higgins himself states he was told, that the debtor had already purchased the Cutlass from Beacon with her own personal check. The implications to a loan officer of such a representation by a borrower would of rational necessity require retention of the loan proceeds pending an opportunity to investigate and to ensure protection of the bank's collateral.

The court concludes that the plaintiff bears the risk of nonpersuasion and that it has failed to establish by a preponderance of the evidence that the debtor obtained money by false pretenses, a false representation, or actual fraud, within the meaning of Bankruptcy Code § 523(a)(2)(A). The debt is held to be dischargeable.