In re Dana E. CUNNINGHAM, Debtor.

Richard D. SMITH, Jr., Plaintiff,

v.

Dana E. CUNNINGHAM, Defendant.

Bankruptcy No. 92–19963.
Adv. No. 92–1876.

United States Bankruptcy Court,
D. Massachusetts.

Jan. 27, 1994.

---

Robert J. Kerwin, Hinckley, Allen, Snyder & Comen, Boston, MA, for plaintiff.

Gary Cruickshank, Boston, MA, for debtor/defendant.

## MEMORANDUM DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

This matter is before the Court on an adversary proceeding commenced by Plaintiff, Richard D. Smith, Jr. ("Plaintiff" or "Smith") against Chapter 7 Debtor, Dana Edward Cunningham ("Debtor"), to determine dischargeability of an obligation under §§ 523(a)(2)(B) and 523(a)(6) and to deny Debtor's discharge under § 727(a)(7). The parties submitted two joint pre-trial statements to the Court before a trial was conducted on October 26, 1993. After the trial, the Court took the matter under advisement and gave the parties the opportunity to file post-trial memoranda. The following constitutes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52 made applicable to these proceedings by Fed.R.Bankr.P. 7052.

### FACTS

In 1987, Plaintiff and his brothers (collectively, the "Smiths") as owners of a contracting company were asked by Debtor and his family (collectively, the "Cunninghams") to join efforts in a real estate venture in Charlton, Massachusetts (the "project"). The Smiths accepted the offer, and the parties began efforts to secure financing.

The parties submitted a loan application to Framingham Savings Bank (the "Bank") to finance the project. Attached to the application were financial statements of several of the participants in the Charlton Project. Included among them was the financial statement of Debtor dated March 31 1987.

The parties executed a $4 million promissory note (the "note") with the Bank on which the Cunninghams, including Debtor, and the Smiths were jointly and severally liable. The note was secured by a first mortgage on all the properties involved in the project.

In 1989 the Smiths and Cunninghams defaulted on the note, and the Bank initiated collection efforts. In lieu of foreclosure, the Bank took the deed to the Charlton properties and collected the remaining $2 million solely from the Smiths. Neither Debtor nor any of the Cunninghams paid any money to the Bank or to the Smiths after the default. On January 1992, the Smiths commenced a state court action against Debtor for contribution and assigned their collective rights to Richard D. Smith, Jr., the Plaintiff in the instant adversary proceeding. On September 30, 1992, Debtor filed a voluntary petition under Chapter 7.

### DISCUSSION

Plaintiff asserts that he has a right to contribution against Debtor in the amount of $1 million and that this debt is nondischargeable pursuant to §§ 523(a)(2)(B) and (a)(6). Plaintiff also asserts that Debtor is not entitled to a discharge under § 727(a)(7).

■ The standard of proof a plaintiff must sustain in a claim arising under § 523(a) and § 727(a) is the "preponderance of the evidence" standard. *Grogan v. Gardner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Court finds that Plaintiff has failed to satisfy his burden with respect to Counts II and III of the complaint relating to § 523(a)(6) and § 727(a)(7) respectively. Insufficient evidence was presented by Plaintiff to support a finding of nondischargeability under § 523(a)(6) or denial of discharge under § 727(a)(7). The only matter left for this Court to determine is whether any debt owed to Plaintiff is nondischargeable under § 523(a)(2)(B).

Section 523(a)(2)(B) states:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, or services reasonably relied; and

(iv) that the debtor caused to be made or published with the intent to deceive.

## MATERIAL FALSITY

Debtor conceded at trial that the written financial statement submitted by him regarding his financial condition was materially false. The Court need not make any findings relative to this issue.

## PLAINTIFF'S STANDING AS A CREDITOR

One of the prerequisites to obtaining an exception to the discharge of a debt under § 523(a)(2)(B) is that the party bringing the action have standing. Section 523(a)(2)(B)(iii) sets forth this threshold requirement, restricting the right to challenge a discharge to a "creditor to whom the debtor is liable."

■ Debtor maintains that the Bank, not the Plaintiff, was the "creditor to whom debtor was liable" when the fraudulent financial statement was executed, and that Plaintiff does not have standing to object to discharge under § 523(a)(2)(B). The Court disagrees and finds that Plaintiff does have standing.

Fed.R.Bankr.P. 4007(a) provides that a creditor may file a complaint objecting to dischargeability of a debt. Section 101(10)(A) defines "creditor" as "an entity that has a claim against a debtor...." A "claim" is defined under § 101(5)(A) to mean "a right to payment, whether or not such right is contingent".

The Court finds that Plaintiff was a creditor of Debtor when the false financial statement was issued because Plaintiff had a *contingent* claim based on the inchoate right to contribution. Even though a cause of action for contribution does not become complete until the claimant pays more than his equitable share of the common liability, *Sword & Shield Restaurant, Inc. v. Amoco Oil Co.,* 11 Mass.App.Ct. 832, 833, 420 N.E.2d 32, 33 (1981), an inchoate right to compel contribution comes into being and becomes the property interest of a joint tortfeasor or co-obligor when the common liability arises. *Id.; D'Onofrio Construction Co. v. Recon Co.,* 255 F.2d 904, 906–909 (1st Cir.1958). In this case, the joint liability of the parties arose when Debtor submitted his false financial statement to the Bank. Accordingly, the Court finds that Plaintiff has standing to object to dischargeability under § 523(a)(2)(B).

## OBTAINED PROPERTY

■ Debtor next argues that the Charlton Project, not the Debtor, "obtained" the money from the Bank and therefore § 523(a)(2)(B) does not apply. There is disagreement among the courts as to whether a debtor must personally possess or consume the money or services at issue in a false financial statement case. See *Century First National Bank v. Holwerda (In re Holwerda),* 29 B.R. 486, 489 (Bankr.M.D.Fla.1983) (citations omitted).

This Court is in agreement with the view expressed in *Holwerda:* "[T]he debtor need not actually procure money or property for himself. If the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable." *Id.* See also *Harris v. Pirnie (In re Pirnie),* 16 B.R. 65, 69 (Bankr.D.Mass.1981) ("Section 17(a)(2) [of the former Bankruptcy Act] applies even when a bankrupt fraudulently obtains property for a party other than himself.")

■ When the parties obtained the loan for the Charlton Project, Debtor realized a benefit for himself. The Court presumes that Debtor was engaged in the project for financial gain, and the procurement of the loan was a step in realizing such gain.

## INTENT TO DECEIVE

■ For purposes of § 523(a)(2)(B), the intent to deceive may be inferred where debtor knew or should have known of the falsity of his financial statement. *Merchant's Nat'l Bank v. Denenberg (In re Denenberg),* 37 B.R. 267, 271 (Bankr.D.Mass.1983). In *Denenberg,* debtor personally prepared a financial statement with a highly inflated and

"far fetched" asset valuation. The court found that in light of the fact that debtor was a college graduate with extensive business experience, the false financial statement was attributable to intentional deceit. *Id.* In the present case, Debtor admits to having submitted a false financial statement to the Bank. Debtor is a college graduate with a degree in accounting. He worked at a nursing home for fifteen years where he was responsible for accounting functions. Based on Debtor's background, the Court finds that Debtor had an intent to deceive when he submitted his admittedly false financial statement.

### REASONABLE RELIANCE

In order to determine whether Plaintiff's reliance on Debtor's false financial statement was reasonable, this Court must first determine whether Plaintiff ever received the statement.

Although Debtor testified that he sent the financial statement only to the Bank and not the Plaintiff, the Plaintiff testified that he did receive a copy of the statement. The Court finds that Plaintiff did receive a copy of the statement. The Court is most persuaded by the agreed upon Exhibit # 12 submitted at trial entitled "Charlton Village Proposal." The proposal contained a number of documents relating to the project including a copy of Debtor's financial statement. Debtor testified at trial that Plaintiff was provided with a copy of the proposal before the parties procured financing from the bank.

■ In 1993, the First Circuit held in *Shawmut Bank, N.A. v. Goodrich (In re Goodrich)*, that where it has been established that a false financial statement was published with an intent to deceive, then "a showing that a creditor relied upon it arguably requires no more than that the creditor took it into account and gave it weight." 999 F.2d 22, 25 (1st Cir.1993). Plaintiff's admission that he received the statement and examined it before he signed the $4 million promissory note as a co-obligor with Debtor is sufficient to show that Plaintiff took the statement into account and gave it some weight.

■ The Court must next determine whether Plaintiff's reliance was reasonable under the circumstances. This Court held in *Northmark Bank v. Herzog (In re Herzog)*, that where a bank has no prior experience with a debtor and there are obvious "red flags" in a financial statement, a bank is considered to be acting unreasonably if it relies on the statement. 140 B.R. 936, 939 (Bankr.D.Mass.1992) citing *First Bank of Colorado Springs v. Mullet (In re Mullet)*, 817 F.2d 677, 681 (10th Cir.1987).

Plaintiff is a college graduate with an accounting degree, he became a C.P.A., and worked for a "Big 8" accounting firm. Before Plaintiff began work on the Charlton Project, he had never met any of the Cunninghams. Although Plaintiff in the instant case is not a lending institution, this Court finds it appropriate to hold him to the heightened standard of reasonableness enunciated in *Herzog* because of his sophistication in business matters and expertise in the area of accounting.

The parties submitted the financial statement at trial as agreed upon Exhibit # 1 in substantially the same form as below.

### ASSETS

| | |
|---|---:|
| Cash on Hand | $ 30,000. |
| Deposit on Real Estate | 35,000. |
| Real Estate Owned | 1,183,233. |
| Real Estate Equities | 352,000. |
| Business Equities | 100,000. |
| Total Assets | $1,700,233. |

### LIABILITIES

| | |
|---|---:|
| Notes Payable | $ · 10,000. |
| Accounts Payable | 5,000. |

| | | |
|---|---|---|
| Real Estate Mortgages Payable | | 714,800. |
| Total Liabilities | | $ 729,800. |

Net Worth     $ 970,433.

## SOURCES OF INCOME

| | |
|---|---|
| Salary–Annual | $ 50,000. |
| Bonus–Commissions | 50,000. |
| Total Income | $ 100,000. |

## SCHEDULE OF REAL ESTATE OWNED

| Property | Mkt. Value | Mtg. | Equity |
|---|---|---|---|
| * Forestside Office Condo (1) | $ 340,000 | $ 260,000 | $ 26,700 |
| * Forestside Office Condo (2) | $1,919,565 | $1,212,000 | $235,855 |
| * Berlin, MA Property | $ 800,000 | $ 650,000 | $ 50,000 |
| * Dodge Hill Estates | $1,120,000 | $ 750,000 | $123,333 |
| * Bethlehem, N.H. Property | $ 240,000 | $ 140,000 | $ 33,400 |
| Danjen Realty Trust | $ 350,000 | $ 115,000 | $235,000 |

* ⅙ Interest

---

The statement contains numerous defects in both form and substance. First, Debtor lists "Real Estate Owned" in the "Asset" section at a total of $1,183,233. Debtor does not indicate whether this figure is based on the "market value" or "cost" of the real estate. However, the supporting "Schedule of Real Estate Owned" indicates "market value". Regardless of whether the real estate was valued at cost or market, Debtor inflated his "Net Worth" by reporting the value of "Real Estate Owned" and then separately reporting "Real Estate Equities" of $352,000 in the "Asset" section. Perhaps Debtor was valuing the real estate at cost and was attempting to report his unrealized appreciation in the property values as an asset in "Real Estate Equities". However, if the reader must speculate to this extent, the statement is facially deficient and merits some kind of affirmative inquiry on the reader.

Second, many of the entries on the statement are vague, such as "Business Equities—$100,000" and "Notes Payable—$10,000". "Business Equities" makes up more than 10% of Debtor's purported net worth, yet there is no description of what this entry includes. "Notes Payable" represents $10,000, but there is no explanation in the statement as to whether these notes were secured or unsecured, or a description of the collateral if they were secured. Furthermore, Debtor reports "Sources of Income" without any corresponding expenses.

Third, the figures provided in the "Asset," "Liability," and "Net Worth" sections do not correspond to the numbers provided in the "Schedule of Real Estate Owned." The total "Market Value" of the properties listed in the "Schedule of Real Estate Owned", after adjusting for Debtor's ⅙ interest in five of the six properties, equals $1,823,188. Debtor lists "Real Estate Owned" in the "Asset" section at a total of $1,183,233. The two figures create a discrepancy of almost $640,000.

The sum of "Equity" from the "Schedule of Real Estate Owned," taking into account Debtor's ⅙ interest, totals $704,288. Ignoring the error of reporting "Real Estate Equities" in the "Asset" section, the "Real Estate Equities" amount totals only $352,000, a figure 50% less than that provided in the "Schedule of Real Estate Owned."

Furthermore, the sum of "Equity" from the "Schedule of Real Estate Owned" of $704,288 does not reconcile with Debtor's net

worth, adjusted to correspond only to his real estate holdings, of approximately $805,000.

The sum of "Mortgages" from the "Schedule of Real Estate Owned" totals $3,127,000. However, the "Real Estate Mortgages Payable" amount from the "Liability" column totals only $714,800. No information is provided in the financial statement regarding the extent of Debtor's liability on the real estate mortgages and the attendant notes. However, the $714,800 figure does not reconcile with Debtor's mortgage indebtedness per his "Schedule of Real Estate Owned" whether he listed the mortgages at face value or adjusted the amounts for his ⅙ interest in five of the six properties ($1,119,000).

Any one of the above inconsistencies would have been a "red flag" to a reasonably acting C.P.A. Collectively, the existence of these inconsistencies casts doubt on Plaintiff's admission that he read the statement at all. In light of Plaintiff's professional background, his unfamiliarity with the Cunninghams, and the many contradictions and irreconcilable differences in the statement, the Court finds that Plaintiff did not prove by a preponderance of the evidence that he reasonably relied on Debtor's financial statement.

For the above stated reasons, the Court finds for the Defendant on all counts of the complaint. A separate order will enter.