In re Richard BAIETTI and
Donna Baietti, Debtors.

**BOMBARDIER CAPITAL,
INC., Plaintiff,**

v.

**Richard BAIETTI, Defendant.**

Bankruptcy No. 94–10166.
Adv. No. 94–1065.

United States Bankruptcy Court,
D. Maine.

Nov. 30, 1995.

Robert S. Lingley, Russell, Lingley & Silver, Bangor, ME, for Donna A. Baietti.

Robert S. Lingley, Russell, Lingley & Silver, Bangor, ME, for Richard A. Baietti.

Gary M. Growe, Trustee, Bangor, ME.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

In this adversary proceeding, Bombardier Capital, Inc., ("Bombardier"), seeks a determination that certain obligations owed to it by Richard Baietti ("Baietti" or "debtor") are excepted from discharge under § 523(a)(2)(A) of the Bankruptcy Code.[1] For the reasons set forth below, I conclude that Baietti's debt to Bombardier in the amount of $25,107.30 is excepted from discharge.[2]

*Facts*

Commencing in 1972, Baietti operated an auto body and auto glass business in Houlton, Maine. About 1974, he incorporated it as Rick's Auto Body, Inc., ("RAB"). Baietti became the corporation's sole shareholder and, in all respects, controlled its affairs.

RAB expanded its activities to include, among other things, pleasure boat sales. With Baietti's personal guaranty, RAB first obtained floor plan financing from Transamerica Capital Corporation. On August 9, 1991, RAB entered into a floor plan financing agreement with Bombardier. Thereafter, Bombardier financed RAB's inventory, including a line of "Stingray" brand boats. Bombardier's financing terms did not vary significantly from Transamerica's. RAB paid 10% down on each Stingray. Bombardier retained a security interest in each boat to secure the balance. "[I]mmediately upon the sale of each item of inventory" RAB was required to pay Bombardier the "total amount due on that item." In addition, Bombardier required monthly interest payments and periodic principal payments (referred to as "curtailments") as the inventory aged. Baietti personally guarantied RAB's obligations to Bombardier.

To police its financing arrangements, Bombardier regularly conducted "floor checks" at dealers, including RAB. Its representative would visit regularly to confirm the extent and condition of unsold inventory. Mr. Gary Davis, Bombardier's district manager from 1991 until early 1994, conducted floor checks at RAB every sixty to ninety days. He would arrive at RAB unannounced, let Baietti know he was there and then check invento-

---

1. The Bankruptcy Code (or "Code") is found at 11 U.S.C. § 101, *et seq.* Unless otherwise indicated, citations to statutory section numbers are to sections within the Bankruptcy Code.

2. This memorandum sets forth findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052 and 9014.

 Bombardier's complaint originally included counts brought under § 727(a) objecting to Baietti's discharge, as well as seeking a determination of nondischargeability under §§ 523(a)(2)(B) and 523(a)(4). At trial, Bombardier withdrew all counts except those under §§ 523(a)(2)(A) and 523(a)(2)(B). The § 523(a)(2)(B) claim was not fully developed at trial or in Bombardier's brief. I will therefore not consider it.

ry on the premises against Bombardier's record of unsold, financed inventory.

Davis would inquire if a unit of inventory was missing (presumably sold), and Bombardier had not been paid. Under such circumstances, Baietti might show that the sale had been reported and a check mailed, might indicate that the unit was off the lot for some acceptable purpose or, in the case of a very recent sale, might tender a payoff check.

In the course of each visit, Davis also discussed with Baietti the status of RAB's account, including late interest and principal payments. Generally speaking, Bombardier's policy regarding overdue principal and interest payments was flexible. Depending on a dealer's circumstances, Bombardier might forbear collecting arrearages awaiting, for example, an anticipated seasonal sales upswing.

But Bombardier's policy regarding inventory sales was strict. It insisted that payment in full of the balance owing on each sold unit be made immediately upon that unit's sale. In the event Bombardier discovered an unreported sale, it insisted that the balance due be paid at once. Although continuing a dealership's financing thereafter was possible, Bombardier generally terminated floor plan financing and liquidated its collateral when a dealer failed to report sales. Bombardier might permit the dealer to liquidate the collateral in the ordinary course, providing that the dealer made some acceptable arrangement for paying promptly the amount due on unreported sales. Otherwise Bombardier would repossess the encumbered inventory and liquidate it itself.

Baietti understood that Bombardier's principal objective in conducting floor checks was to determine whether there had been unreported sales by confirming that each unit shown as unsold on Bombardier's records was, in fact, on site at the dealership.

Commencing in July 1992, RAB sold five Bombardier-financed boats without reporting the sales to Bombardier or paying off the loan balances encumbering each boat:

| Date | Unit Sold (Purchaser) | Due to Bombardier at Sale |
|---|---|---|
| 7/10/92 | 1992 Stingray (Graham) | $ 6,745.20 |
| 9/3/92 | 1993 Stingray (Westerdahl) | $ 7,304.40 |
| 1/14/93 | 1993 Stingray (Hartin) | $10,881.90 |
| 4/1/93 | 1993 Stingray (Bishop) | $ 7,126.20 |
| 1993 | 1993 Stingray (Anderson) [3] | $ 7,099.20 |

All the while, floor checks continued regularly. During each floor check, the previously sold boats were sitting on the RAB lot, by all appearances still for sale.

Because the boats remained on the lot, Davis investigated no further. For all he knew, Bombardier's collateral was not impaired and payoffs were not yet due. Davis routinely called in his inspection results to Bombardier in Baietti's presence. Baietti, knowing that appearances had deceived Davis (postponing the day of reckoning with Bombardier), volunteered no information. On at least two occasions he initialed Davis's inventory reports without illuminating comment.

As time passed, RAB's arrearages on the Bombardier account mounted. On December 28, 1993, Bombardier demanded additional collateral as a condition for continued financing. Shortly thereafter, Baietti concluded that the business could stay afloat no longer. With Baietti's consent, Bombardier entered RAB's premises and repossessed its collateral in February 1994. All the Stingray boats it expected to find were there. But Bombardier soon discovered the five unreported sales. Rather than liquidating them to reduce RAB's obligations, it had to release the boats to their owners.[4]

*Discussion*

1. *Burden of Proof.*

■ A creditor seeking a determination of nondischargeability under § 523(a) must prove the discharge exception elements by a preponderance of the evidence. *See Grogan*

---

3. *See* discussion *infra* at page 558.

4. The boats passed to RAB's retail customers free of Bombardier's security interests. *See* 11 Me. Rev.Stat.Ann. § 9–307(1) (West 1995).

*v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *Commerce Bank & Trust Co. v. Burgess (In re Burgess)*, 955 F.2d 134, 136 n. 2 (1st Cir.1992).

### 2. Elements of § 523(a)(2)(A).

To establish that its claim is excepted from discharge, Bombardier must demonstrate that Baietti's debt to it is one for "money, property, services, or an extension, renewal or refinancing of credit" obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...." 11 U.S.C. § 523(a)(2)(A).

Under § 523(a)(2)(A) and First Circuit precedent, creditors have historically been required to show that the debtor obtained money, property or credit "by means of representations which he knew were false or which were made with reckless disregard for their truthfulness, that the debtor intended to deceive the creditor through misrepresentations, and that the creditor reasonably relied, to his detriment on [those] misrepresentations." *Wallingford's, Inc. v. Waning (In re Waning)*, 120 B.R. 607, 610 (Bankr.D.Me. 1990); *see In re Burgess*, 955 F.2d at 140; *Hardy v. McCaffrey (In re McCaffrey)*, 150 B.R. 301, 303 (Bankr.D.R.I.1993); *Macaulay v. Shields (In re Shields)*, 147 B.R. 627, 629 (Bankr.D.Mass.1992).

▮▮▮▮ The Supreme Court has recently overruled First Circuit law in one respect: the character of reliance a creditor must prove under § 523(a)(2)(A) is "justifiable" reliance, rather than "reasonable" reliance. *Field v. Mans*, —— U.S. ——, ——, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995).[5] The other elements of § 523(a)(2)(A) nondischargeabili-

ty are unchanged. *Id.* at ——, 116 S.Ct. at 443.[6]

### 3. False Pretenses, False Representations or Actual Fraud.

Express written or oral misrepresentations are not § 523(a)(2)(A)'s exclusive province. The section encompasses two additional categories of debtor misconduct: "false pretenses" and "actual fraud." In the mill-run case, careful distinctions among the three categories is unimportant, leading some courts to opine that they are functionally equivalent. *Thorp Credit and Thrift Co. v. Pommerer (In re Pommerer)*, 10 B.R. 935, 938 (Bankr.D.Minn.1981); 3 Collier on Bankruptcy ¶ 523.08[4] & n. 11 (Lawrence P. King, ed., 15th ed. 1995) (distinguishing actual fraud from false pretenses or representation, treating the latter two interchangeably, but noting that some courts do analyze false pretenses and representations differently); 3 William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d § 47:14 n. 98 (1994) ("There is no significant difference between the three terms [false pretenses, false representations, or actual fraud]; fraud ... includes false pretenses and false representations...."). In appropriate circumstances, however, courts have described "false pretenses" as a species of wrongful conduct related to, but distinct from, "false representation" and "actual fraud." It has been described as:

> a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to

---

**5.** Justifiable reliance is an "intermediate level of reliance," connoting something more than mere reliance in fact, something less than reasonable reliance. *Id.* —— U.S. at —— – ——, 116 S.Ct. at 443–44, 133 L.Ed.2d 351. It is a subjective standard, applied in view of " 'qualities and characteristics of the particular plaintiff, and the circumstances of the particular case.' " *Id.* at ——, 116 S.Ct. at 443. (quoting Restatement (Second) of Torts § 545A cmt. b (1976) (hereinafter "Restatement")). To establish justifiable reliance, one is " 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if

he had utilized his opportunity to make a cursory examination or investigation.' " *Id.* at ——, 116 S.Ct. at 444 (quoting Restatement § 541).

**6.** *Field v. Mans* applied the justifiable reliance standard to a case in which the trial court had concluded that the debtor committed fraud. The Court did note that "[a]lthough we do not mean to suggest that the requisite level of reliance would differ if there should be a case of false pretense or representation but not of fraud, there is no need to settle that here." *Id.* —— U.S. at —— n. 8, 116 S.Ct. at 443 n. 8.

transfer property or extend credit to the debtor. "False pretense" may, but does not necessarily, include a written or express false representation. It can consist of silence when there is a duty to speak. *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr.D.Colo.1990), *partially rev'd on other grounds*, 146 B.R. 269 (D.Colo.1992), *quoted in Check Control, Inc. v. Anderson (In re Anderson)*, 181 B.R. 943, 950 (Bankr. D.Minn.1995); *see also Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir.1987) (debtor's silence can constitute false pretenses where there is an intention to deceive); *Durbin v. Miranda (In re Miranda)*, 172 B.R. 55, 60 (Bankr.E.D.Mo. 1994) (debt excepted from discharge where debtor, seller of a vehicle, failed to inform purchaser that others also held an interest in the car); *Hile v. Lewis (In re Lewis)*, 164 B.R. 588, 591 (Bankr.N.D.Ohio 1994) (describing false pretenses as implicit misrepresentations intended to create or foster a false impression, but finding that debtor had not engaged in false pretenses); *Galvin v. Cole (In re Cole)*, 164 B.R. 947, 949 (Bankr. N.D.Ohio 1993) (excepting from discharge contractor's obligation for funds obtained from a customer for the purchase of materials but applied to pay off business debts).

■ "False pretenses" is a variation on § 523(a)(2)(A)'s theme. It encompasses " 'implied representations, or conduct intended to create or foster a false impression.' " *Citizens & Southern Nat'l Bank v. Thomas (In re Thomas)*, 12 B.R. 765, 767 n. 3, 769 n. 9 (Bankr.N.D.Ga.1981) (quoting *Davison–Paxon Co. v. Caldwell*, 115 F.2d 189, 193 (5th Cir.1940) (Sibley, J., dissenting)). Intentional deceit is a critical note in the score. *Id.* As with other provisions of § 523(a), however, there is scant room for improvisation in light of the admonition that discharge exceptions are to be read narrowly, not expansively, so as to afford the "honest but unfortunate" debtor a "fresh start." *Gleason v. Thaw*, 236 U.S. 558, 561, 35 S.Ct. 287, 288–89, 59 L.Ed. 717 (1915); *In re Burgess*, 955 F.2d at 137; *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987) (quoting *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir.1934)). "To prevail in a dischargeability proceeding under § 523(a)(2)(A), a plaintiff must demonstrate that the debtor engaged in conduct that is truly blameworthy in an everyday sense, as well as in a technical, legal sense." *In re Anderson*, 181 B.R. at 948.

### 4. Intentional Deceit: A Stingray Sting.

■ Essential to Bombardier's claim is a showing that Baietti knowingly or recklessly employed false pretenses or false representations *intending* to deceive it. *In re Burgess*, 955 F.2d at 140; *In re Waning*, 120 B.R. at 610; *Depositors Trust Co. v. Nichols (In re Nichols)*, 6 B.R. 842, 845 (Bankr.D.Me.1980).

■ Bombardier claims that Baietti knowingly misrepresented the state of RAB's inventory by placing previously sold boats on RAB's lot during Bombardier's floor inspections and by failing to rectify Davis's obvious misunderstanding when he tallied those boats as unsold units. Baietti asserts that the previously sold Stingrays were at the dealership for storage or repair and that he had no affirmative duty to dispel Davis's confusion.

Baietti characterizes his role in Bombardier's misapprehension as that of a silent onlooker. Thus, he argues his conduct cannot sustain a § 523(a)(2)(A) nondischargeability finding. *See, e.g., Rochester Hills Chrysler Plymouth v. Phillips (In re Phillips)*, 153 B.R. 758, 761 (Bankr.E.D.Mich. 1993) (silence by itself does not rise to § 523(a)(2)(A) fraud); *Hawthorne Corp. v. Grogan (In re Grogan)*, 146 B.R. 866, 870–71 (Bankr.M.D.Fla.1992) (absent a duty of disclosure imposed by law or willful concealment of facts requested by the creditor, silence does not constitute a misrepresentation under § 523(a)(2)(A)); *see also Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1580 (11th Cir.1986) (debtor has no duty to volunteer information relevant to his creditworthiness in the absence of meaningful creditor inquiry); *Flint Area School Employee Credit Union v. Nogami (In re Nogami)*, 118 B.R. 846, 848 (Bankr.M.D.Fla.1990) (failure to disclose alone will not support nondischargeability, but pattern of conduct intended to evade detection of important information may amount to fraud).

The premise that "silence can't constitute fraud" is misleading in its simplicity. Be it called "false pretenses" or "fraud," intentional deceit perpetrated by silence has long been recognized as a ground for nondischargeability under § 523(a)(2)(A):

> "Actual" fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. *In re Davis,* 11 B.R. 156, 158 (Bankr.D.Vt.1980). However, fraud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact.

*Leeb v. Guy (In re Guy),* 101 B.R. 961, 978 (Bankr.N.D.Ind.1988), (citing *In re Frye,* 48 B.R. 422, 426 (Bankr.M.D.Ala.1985); *In re Samford,* 39 B.R. 423, 427 (Bankr.M.D.Tenn. 1984); *In re Weinstein,* 31 B.R. 804, 809 (Bankr.E.D.N.Y.1983); *In re Slutzky,* 22 B.R. 270, 272 (Bankr.E.D.Mich.1982)).

In any event, Baietti was much more than an innocent bystander to Bombardier's befuddlement. Although all the circumstances under which previously sold boats found their way to RAB's lot in time for Davis's inspections are not apparent, Baietti knew full well where they were, how they appeared and how their presence was misleading. He created (and later perpetuated) Bombardier's false impression.[7] Baietti fostered Bombardier's false impression, knowing that, had it learned the true state of affairs, it would have terminated financing and repossessed its remaining collateral.[8] The evidence leaves no doubt that at the time Baietti misled Davis, he intended to do so.

### 5. Pointing the Finger at the Corporation: No Avail.

▆▆ At the threshold, Baietti argues that, to the extent that credit may have been extended or property obtained as a consequence of misrepresentations or false pretenses, the corporation received it, not him. He considers what he owes Bombardier to be simply a guaranty obligation, which is not a proper subject for a § 523(a)(2)(A) complaint.

▆▆ Baietti's attempts to station himself in the corporation's lee are unavailing. To begin, § 523(a)(2)(A) does not require that a debt excepted from discharge be one for property acquired *by the debtor* or credit extended *to the debtor.*[9] Courts generally conclude that when a debtor, through fraud, obtains some benefit, albeit an "attenuated"

---

7. Baietti was in charge at RAB. Bombardier's floor checks were sufficiently regular to be anticipated. And, given the other evidence in the record, I conclude that Baietti arranged or permitted the previously sold Stingrays to be on the lot *in order to mislead* Bombardier. I cannot accept the proposition that, given RAB's standing with Bombardier and Baietti's admission that he delayed reporting sales to Bombardier to "buy time," the sold boats' presence on RAB's lots during floor checks was serendipitous.

8. Baietti asserts that Bombardier's practice, as opposed to its formal policy, did not mandate repossession and liquidation of a dealer's financed inventory in the event of an unreported sale. Although Davis's testimony provides some evidence that there may have been cases in which Bombardier did not initiate repossession in such circumstances, I conclude that it would not have been so forgiving of RAB in this case. At the time of the Stingray sales in question, RAB was substantially in arrears for monthly interest and principal payments.

9. The statute excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud...." § 523(a)(2)(A). It does not expressly require that the *debtor* be the one to have obtained it. The operative language defines the debts that will be excepted from discharge by the manner of their creation only. *See Jacobs v. Mones (In re Mones),* 169 B.R. 246, 252–53 (Bankr.D.D.C.1994); *see also, e.g., Smith v. Cunningham (In re Cunningham),* 163 B.R. 657, 660 (Bankr.D.Mass.1994); *Designed Flooring Distributors, Inc. v. Wagenti (In re Wagenti),* 110 B.R. 602, 605 (Bankr.S.D.Fla.1990); *European American Bank v. Gitelman (In re Gitelman),* 74 B.R. 492, 496 (Bankr.S.D.Fla.1987); *FDIC v. Bombard (In re Bombard),* 59 B.R. 952, 954 (Bankr.D.Mass.1986); *Takeuchi Mfg. v. Fields (In re Fields),* 44 B.R. 322, 329 (Bankr.S.D.Fla. 1984); *cf. Republic Bank v. Vermont (In re Vermont),* 98 B.R. 581, 583–84 (Bankr.M.D.Fla. 1989) (analyzing § 523(a)(2)(B)); *First Nat'l Bank v. Mann (In re Mann),* 40 B.R. 496, 499 (Bankr.D.Mass.1984) (same); *Harris v. Pirnie (In re Pirnie),* 16 B.R. 65, 68 (Bankr.D.Mass.1981) (interpreting state law).

one, from property or credit provided to a third party, he or she may not evade nondischargeability by claiming that he or she did not *directly* receive the benefit of the transaction. *See, e.g., Ashley v. Church (In re Ashley),* 903 F.2d 599, 604 (9th Cir.1990). Others have held that § 523(a)(2)(A) may operate on a fraudulent debtor's liability even when he or she received *no* benefit. *See Central Finance Co. v. Carroll (In re Carroll),* 16 B.R. 494 (D.Minn.1982).

For today, it is unnecessary to decide whether some benefit to the debtor is a prerequisite to § 523(a)(2)(A) nondischargeability. Baietti participated directly in misleading Bombardier. He benefited directly from the deception. He used Bombardier's property (Stingray sales proceeds) to reduce personal liabilities (e.g., a business mortgage debt and unpaid obligations to Transamerica), to pay himself a salary and to shore up RAB's shaky finances so that it could continue operations (an activity that redounded directly, and virtually exclusively, to his benefit).

■ In such instances, "an officer, director or shareholder of a corporation will not be shielded by the corporate form from liability for a tort, including fraud, in which he himself is involved." *Takeuchi Mfg. v. Fields (In re Fields),* 44 B.R. 322, 327 (Bankr.S.D.Fla.1984). Neither Baietti's personal guaranty or an exercise in piercing the corporate veil plays a role in his liability. The obligation subject to § 523(a)(2)(A)'s discharge exception is Baietti's *tort* liability. *See Field v. Mans,* —— U.S. ——, ——, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (text of § 523(a)(2)(A) refers to common law torts); *McMillan v. Firestone (In re Firestone),* 26 B.R. 706, 714 (Bankr.S.D.Fla.1982); *see also Hemelt v. Pontier (In re Pontier),* 165 B.R. 797, 799 (Bankr.D.Md.1995); *In re Wagenti,* 110 B.R. at 605. *See generally* Norton, *supra,* § 47:13 (discussing § 523(a)(2) as one of the Code provisions regarding tort liability). The debt is within § 523(a)(2)(A)'s reach.

### 6. Describing the Debt:

#### a. How Far Does Extension Extend?

Bombardier claims that Baietti's wrongful concealment of Stingray sales led to an involuntary "extension" of credit that would otherwise have been terminated. As soon as it would have discovered RAB's first unreported sale, Bombardier claims it would have terminated financing and liquidated its collateral, receiving no less than the loan balance secured by each Stingray.[10]

In response, Baietti points out that under § 523(a)(2)(A) the creditor must prove "a causal link between any specific actions of the Debtor and its own provision of credit." *In re Waning,* 120 B.R. at 612; *see also In re Burgess,* 955 F.2d at 140 (under § 523(a)(2)(A) creditor must show losses "resulted from" reliance on fraudulent conduct); *cf. Shawmut Bank v. Goodrich (In re Goodrich),* 999 F.2d 22, 25–26 (1st Cir.1993) (under § 523(a)(2)(B) creditor need not show "damage or detriment" beyond renewal or refinancing made in reliance on false financial statement). Because Bombardier provided no *new* credit or property to Baietti after he concealed the first (and second, third, fourth and fifth) Stingray sale, he asserts it cannot prevail.

The question whether forbearance obtained by fraud or false pretenses constitutes obtaining property or credit within the meaning of § 523(a)(2)(A) is dicey. Without having spoken directly to the point, the First Circuit has expressed some skepticism about the notion. *In re Burgess,* 955 F.2d at 140. Other courts have no trouble with the concept, at least where credit has already been called, *FDIC v. Cerar (In re Cerar),* 84 B.R. 524 (Bankr.C.D.Ill.1988), *aff'd* 97 B.R. 447, 451 (C.D.Ill.1989); *see also Zarate v. Baldwin (In re Baldwin),* 578 F.2d 293, 295 (10th Cir.1978), or where the obligation in question is due on demand and the debtor's conduct leads the creditor to forbear making demand, leading to losses that would otherwise have been avoided. *See Marine Bank Southwest v. Hoffman (In re Hoffman),* 80 B.R. 924, 926 (Bankr.N.D.Ill.1988); *First Federal Savings and Loan Assoc. v. Mancini (In re*

---

**10.** Baietti does not dispute Bombardier's claimed measure of harm upon repossession. Bombardier would have realized from the disposition of each boat no less than the outstanding loan balance secured by it.

*Mancini),* 77 B.R. 913, 916 (Bankr.M.D.Fla. 1987); *First Bank v. Eaton (In re Eaton),* 41 B.R. 800, 802 (Bankr.E.D.Wis.1984).

 To the extent that fraudulently induced forbearance and loss might lead to nondischargeable obligations under § 523(a)(2)(A), I decline to embrace the concept here.[11] The acts Baietti concealed were breaches of the floor plan financing agreement, the discovery of which would have led to termination and collection. To hold that concealing (or delaying reports of) contract breaches results in an involuntary credit "extension" creating § 523(a)(2)(A) nondischargeability goes too far. The concept could transmogrify dischargeable breach of contract claims into nondischargeable "extension of credit" § 523(a)(2)(A) claims. *See generally In re Guy,* 101 B.R. at 978. The theory is sufficiently elastic to reach the claims of unsecured creditors who delayed initiating collection action (and, say, obtaining interlocutory attachments) in reliance on a debtor's statement that "the check is in the mail." They could assert that during the time that they "relied" on the "representation" the debtor's (collectible) net worth diminished, causing them "loss." Such a rule holds potential for too much mischief. *See Howard & Sons, Inc. v. Schmidt (In re Schmidt),* 70 B.R. 634, 644 (Bankr.N.D.Ind. 1986) (forbearing collection efforts does not constitute an extension of credit); *Drinker, Biddle & Reath v. Bacher (In re Bacher),* 47 B.R. 825, 829 (Bankr.E.D.Pa.1985) (same).

### b. The Analysis Proceeds: Obtaining Property Improperly.

 In any event, stretching § 523(a)(2)(A) to such lengths is unnecessary. The statute easily reaches Baietti's conduct. By selling encumbered Stingrays and misappropriating their proceeds, Baietti wrongfully obtained Bombardier's property, thereby creating nondischargeable obligations. *See e.g., In re Fields,* 44 B.R. 322, 329 (explaining that debtor's failure to remit inventory sales proceeds to secured party by deceiving inventory checkers constituted "obtaining property" rather than an "extension" of credit); *cf. In re Schmidt,* 70 B.R. at 642 (holding that debtor has not received property of the creditor where debtor fraudulently obtained release of an unsecured claim that would have been discharged in bankruptcy notwithstanding).

Bombardier's security interest in the Stingray boats and their proceeds sets Baietti's debt to it apart from debts owed unsecured creditors. Baietti's deceptive conduct enabled him to take Bombardier's property by converting its collateral and proceeds. In this light, Bombardier's § 523(a)(2)(A) claim is strictly garden variety.[12]

---

**11.** The facts of *Field v. Mans,* in which a second mortgagee failed to enforce a "due on sale" clause in reliance upon misrepresentations regarding whether a conveyance had occurred, might be read as presenting an "involuntary extension of credit" nondischargeability claim. However, the case was litigated exclusively on reliance issues. *Field,* —— U.S. ——, at —— n. 2, 116 S.Ct. 437, at 440 n. 2. In a concurring opinion, Justice Ginsberg observed that the question whether the debtor had "obtained" credit by his fraud remained open. *Id.* at ———— ——, 116 S.Ct. at 447–448.

**12.** Contrary to Baietti's contention, this court's holding in *In re Waning* is not inconsistent with today's result. In *Waning,* the debtor's failure to report sales and pay his supplier occurred, for the most part, as a consequence of sloppy record keeping and was not accompanied by an intention to deceive. *120 B.R. at 611.* The supplier paid little attention to Waning's sales reports, other than to measure what new goods to provide him and did not rely reasonably on the inventory and account information he submitted. *Id.* Although the debtor did admit to intentionally inflating his accounts receivable reports one time in an effort to forestall his supplier, the report was submitted *after* the supplier cut off his credit and supplies. 120 B.R. at 612. *Waning's* observation that, had the creditor proved that the debtor acquired property from it "as a result of false pretenses or representations," its claim would be excepted from discharge in that amount, supports Bombardier's position here.

The creditor's § 523(a)(2)(A) theory in *Waning* typifies the brand of claim addressed in the "involuntary extension of credit" discussion, *supra,* in one respect. It argued, unsuccessfully, that, had the debtor timely and accurately provided sales information (*i.e.* reported contract breaches), it could have terminated its relationship with him before its losses grew so large. 120 B.R. at 612.

### 7. Reliance Issues: What You See and What You Get.

■ Bombardier actively policed its secured credit relationship with RAB. *Cf. Michigan Steel Erectors, Inc. v. Crane (In re Crane),* 154 B.R. 60, 64 (Bankr.E.D.Mich. 1993); *Marx v. Reeds (In re Reeds),* 145 B.R. 703, 708 (Bankr.N.D.Okla.1992); *First Leasing and Funding, Inc. v. Black (In re Black),* 113 B.R. 79, 83 (Bankr.M.D.Fla.1990). Its representative personally visited RAB's location to physically examine the stock of financed inventory every sixty to ninety days. During those visits, Bombardier's agent reviewed the status of the dealer's account and affirmatively inquired regarding missing inventory and accrued arrearages. It relied on its agent's firsthand observations and had no reason to suspect that those observations did not reflect reality.

One could not fairly require a creditor to be more vigilant. Whether Bombardier's conduct is measured against a reasonable reliance standard or against a justifiable reliance standard, it has satisfied its burden.[13] Bombardier's reliance on the facts as they appeared caused it to leave its collateral in Baietti's hands, enabling him wrongfully to appropriate its property for his own purposes.[14]

### 8. Extent of the Nondischargeable Debt: How Sharp the Sting?

■ Baietti's debt to Bombardier is excepted from discharge only "to the extent" that it resulted from his false pretenses. *In re Burgess,* 955 F.2d at 140; *In re Waning,* 120 B.R. at 612. I credit Bombardier's proof and find that, had unreported Stingray sales come to light in the course of the first floor check following them, it would and could have prevented losses flowing from later unreported sales. As a result, Baietti's debt to Bombardier is nondischargeable insofar as he acquired Bombardier's property *after* unreported sales were first concealed through false pretenses.

The first unreported sale took place on July 10, 1992. The parties agree that Bombardier's next floor inspection took place within the next ninety days. Baietti wrongfully concealed that sale during that and subsequent inspections. Although the precise date of that first inspection is not known, it could have occurred no later than mid-October 1992. Certainly the first (Graham) and, as likely as not, the second (Westerdahl) unreported sale occurred before Baietti first deceived Bombardier.

Thus, Baietti's deception enabled him to misappropriate proceeds of the third (Hartin—proceeds due Bombardier: $10,881.90) and the fourth (Bishop—proceeds due Bombardier: $7,126.20). The date of the last sale (Anderson—proceeds due Bombardier: $7,099.20) is not pinpointed in the evidence. But the parties' factual stipulation contains sufficient detail (*e.g.,* the boat was a 1993 model, it was returned to RAB for storage in October 1993) from which I infer that, more likely than not, it took place well after October 1992, probably during 1993.

Thus, Baietti's false pretenses enabled him to obtain $25,107.30 in Stingray sales proceeds that were rightfully Bombardier's. The funds have not been repaid. The debt will not be discharged.

### Conclusion

Pursuant to § 523(a)(2)(A), I conclude that Baietti's debt to Bombardier is nondischarge-

---

**13.** Because today's decision considers Bombardier's claim under the false pretenses model, a question might endure as to whether reasonable reliance remains the required showing. *See supra* note 6. On the facts of this case, the difference between the standards is of no moment.

**14.** In concluding that Bombardier's reliance was reasonable, I have not overlooked testimony of both Baietti and Davis that the floor check was often conducted hurriedly and that, rather than exploring the status of inventory found on RAB's premises, Davis only made specific inquiries of Baietti in instances when a unit of inventory was missing. Baietti's knowledge of the purpose of the floor checks and the checker's practice to investigate only the status of missing units reveals the essence of his deceit.

able in the amount of $25,107.30.[15] A separate order to that effect will enter forthwith.

---

**15.** I recognize that so-called "collateral conversion" cases are most often brought under § 523(a)(6). Because Bombardier did not bring a claim under that provision, I express no opinion whether the facts of this case would lead to a finding of nondischargeability, or what the extent of nondischargeable debt might be, under § 523(a)(6). *See Collora v. Leahy (In re Leahy),* 170 B.R. 10, 15 n. 8 (Bankr.D.Me.1994).